1   Jeff D. Friedman (173886)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   715 Hearst Avenue, Suite 202
    Berkeley, California 94710
3   Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
4
    Steve W. Berman
5   Barbara A. Mahoney
    HAGENS BERMAN SOBOL SHAPIRO LLP
6   1918 Eighth Avenue, Suite 3300
    Seattle, Washington 98101
7   Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
8
    [*Additional Counsel listed on*
9   *signature page*]

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12
    THE COMMONWEALTH OF VIRGINIA,          No. **C11-02782** JSC
13
                           Plaintiff,       COMPLAINT
14
15          v.

16  MCKESSON CORPORATION, ROBERT
    JAMES, AND GREG STEPHEN YONKO,
17
                           Defendants.
18

19

20

21

22

23

24

25

26

27

28

    COMPLAINT

    001821-28 451449 V1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................ 11

III. PARTIES ............................................................................................................... 12

IV. STATEMENT OF FACTS .................................................................................... 13

    A. Drug Manufacturers and NDCs ................................................................. 13

    B. The Wholesale Acquisition Cost ................................................................ 14

    C. The Average Sales Price ............................................................................. 15

    D. The Average Wholesale Price ..................................................................... 15

    E. The WAC-to-AWP Spread ......................................................................... 16

    F. Drug Wholesalers ....................................................................................... 16

    G. Wholesaler Sales Transactions ................................................................... 17

    H. Retail Pharmacy Channel ........................................................................... 18

    I. The Private End Payors for Prescription Drugs .......................................... 19

    J. End Payors' Drug Reimbursements are AWP-Based .................................. 19

    K. Like Most Medicaid Agencies, Virginia Medicaid Reimburses Brand
        Drugs Based on AWPs ............................................................................... 21

    L. Medicare Drug Reimbursements are AWP-Based ...................................... 22

    M. PBMs .......................................................................................................... 23

    N. Usual & Customary (uninsured) Payors ..................................................... 25

    O. The Brand Drug Pharmaceutical Market was Conducive to the Scheme ... 25

    P. Private and Public End Payors Rely on Published Drug Pricing Compendia ............. 26

    Q. The Emergence of First Data and Medi-Span as Electronic Data Publishers ............. 27

    R. The Merger of First Data and Medi-Span Systems ..................................... 29

    S. First Data Gains the Trust of the Pharmaceutical Industry ......................... 30

    T. The Scheme Created Goodwill for McKesson with Its Retail Pharmacies ................. 32

    U. By 2001, First Data WAC-to-AWP Mark-ups Were Susceptible to Abuse ............... 33

V.   McKesson's Public Position was that AWPs were Determined by
     Manufacturers' Historic Mark-Ups and not by McKesson ......................................... 34

W.   Contrary to its Official Position, McKesson Raised its Internal Mark-Ups
     in an Effort to Increase AWPs ................................................................................... 36

X.   McKesson Colluded With First Data to Increase Brand Drug Mark-Ups .................. 40

Y.   McKesson Sought to Conceal its Collaboration with First Data ................................ 52

Z.   McKesson Benefited From the Scheme ...................................................................... 54

AA.  McKesson's Internal Documents Admit the Long-Term Effects of the Scheme ........ 58

BB.  Evidence from Manufacturers Also Confirms the Existence of the Scheme
     and the Impact on the Market ..................................................................................... 60

CC.  The Other Major Wholesalers – Amerisource Bergen and Cardinal – Declined
     to Manipulate AWP or Participate in any Scheme With First Data ............................ 63

     1.   While Cardinal and ABC faced the same pressures as McKesson
          to increase profit margins for their pharmacy customers, they did
          not manipulate AWP ......................................................................................... 63

          a.   Cardinal ................................................................................................. 63

               (1)   Where possible, Cardinal set its "Reference Price"
                     based on what manufacturers told Cardinal ............................. 63

               (2)   Cardinal ensured that its AWP Reference Price would
                     not be confused with FDB's AWPs ......................................... 64

               (3)   Cardinal never responded to First Data "surveys" ................. 64

               (4)   Cardinal refused to respond to customer pressures to
                     raise its mark-up ...................................................................... 66

          b.   AmerisourceBergen ............................................................................... 67

               (1)   AmerisourceBergen based its AWPs on manufacturer
                     information and, when that source dried up, on First
                     Data's AWP .............................................................................. 67

               (2)   ABC never responded to First Data "surveys" ........................ 67

               (3)   Despite pressure from its customers to raise its mark-up,
                     ABC adhered to manufacturers' historic mark-ups ................. 68

DD.  As the foreseeable and intended result of McKesson's Scheme, Virginia
     Medicaid overpaid its Pharmacy providers for the Marked-Up Drugs ...................... 68

EE.  American Pipe Tolling ............................................................................................... 68

FF.  Tolling Agreement ..................................................................................................... 69

COMPLAINT

- ii -

001821-28 451449 V1

GG. Fraudulent Concealment........................................................................................69

V. CLAIMS FOR RELIEF..................................................................................................74

COUNT I CIVIL RICO (18 U.S.C. § 1962(C)) (against McKesson)................................................74

A. McKesson and First Data Formed an Association-in-Fact RICO Enterprise..............75

B. McKesson Associated with the Enterprise..................................................................76

C. The Enterprise Affected Interstate Commerce.............................................................77

D. McKesson Conducted the Affairs of the Enterprise.....................................................77

E. The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail or Wire Fraud Violations......................................................................................79

    1. The McKesson-FirstDataBank Enterprise engaged in a Scheme to defraud Public Payors.........................................................................................80

    2. McKesson specifically intended to defraud Public Payors ..............................80

    3. The Enterprise made use of the U.S. mails and interstate communications in furtherance of this Scheme................................................81

F. Virginia Relied on the Accuracy of the Falsely Inflated AWPs Published by First Data or Medi-Span.................................................................................................82

G. McKesson Knew and Intended that Medicaid Agencies, like Virginia Medicaid, would be Injured by the Scheme. ..................................................................................83

H. Damages Caused by McKesson's Scheme...................................................................84

COUNT II RICO CONSPIRACY (18 U.S.C. § 1962(D)) (against McKesson)................................84

I. McKesson Knew and Adopted the Illegal Purpose of the Enterprise ..........................84

J. McKesson Engaged in Activities to Further the Goals of the Enterprise....................85

K. Damages Caused by McKesson's Scheme...................................................................85

L. McKesson is Jointly and Severally Liable for the Conduct of the Enterprise.............85

COUNT III VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT (VIOLATIONS OF VA. CODE § 8.01-216.3(A)(1)) (against McKesson) ......................................................86

COUNT IV VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT (VIOLATIONS OF VA. CODE § 8.01-216.3(A)(2)) (against McKesson) ......................................................87

COUNT V VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT (VIOLATIONS OF VA. CODE § 8.01-216.3(A)(3)) (against McKesson) ......................................................88

COUNT VI VIRGINIA FRAUD STATUTE (VIOLATIONS OF VA. CODE § 32.1-312) (AGAINST ALL DEFENDANTS) ......................................................................88

COMPLAINT

001821-28 451449 V1

COUNT VII  CONSPIRACY TO DEFRAUD  (against All Defendants)............................................ 90

PRAYER FOR RELIEF .................................................................................................................. 91

## I. INTRODUCTION

1. Plaintiff Commonwealth of Virginia ("Plaintiff" or "the Commonwealth") brings this action pursuant to the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 and 1962. McKesson and its officers or employees associated itself with First DataBank, Inc. ("FDB" or First Data") and its officers or employees to form a RICO association-in-fact and engage in a pattern of Racketeering activity including multiple episodes of mail and wire fraud, all designed to increase the AWP for brand-name drugs. McKesson and its co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy to violate RICO. The Commonwealth was injured in its property as a result of the deceptive practices undertaken by the RICO associations-in-fact and seeks to obtain treble damages against McKesson for payments made for prescriptions of brand-name drugs.

2. Plaintiff also brings this action pursuant to the Fraud Against the Taxpayer Act, VA. CODE ANN. § 8.01-216.1, *et seq.* against McKesson, the Virginia Fraud Statute, VA. CODE § 32.1-312, and Virginia common law to recover damages against McKesson and individual defendants Robert James and Greg Stephen Yonko incurred by the Commonwealth and to seek civil penalties, as provided by law.

3. This action follows similar actions by other third party payors for prescription drugs who were injured by McKesson's conduct. For example, McKesson settled a RICO suit filed by a class of private third party payors shortly before trial for $350 million. *New England Carpenters Health Ben. Fund v. First DataBank, Inc.*, 05-cv-11148 (D. Mass.). Notably, at the time it settled this class action, McKesson announced it was creating a reserve of $143 million for "outstanding and expected future AWP-related claims by public entities" such as those asserted here by the Commonwealth. McKesson also recently settled a similar suit by the State of Connecticut shortly before trial. *State of Connecticut v. McKesson Corp.*, 08-cv-10900 (D. Mass.). In addition, McKesson continues to face claims by numerous State Medicaid programs in matters pending across the country and, since 2008, has faced an action with a proposed class of non-Medicaid governmental entities in *In re McKesson Governmental Entities AWP Litig.*, 08-cv-10843 (D. Mass.).

- 1 -

4. The Commonwealth of Virginia, through the Virginia Department of Medical Assistance Services, administers the Virginia Medicaid program. Virginia Medicaid provides health coverage to low-income Virginia residents, including families with children, pregnant women, medically needy individuals, the elderly, and people with disabilities. On behalf of its beneficiaries the Commonwealth pays for medical benefits, including prescription drugs and reimburses pharmacists and other health care providers for certain drugs dispensed or administered to Medicaid recipients. For all times relevant to this lawsuit Virginia Medicaid reimburses its pharmacies for brand drugs on the basis of the Average Wholesale Price ("AWP") plus a dispensing fee.

5. McKesson is the largest national wholesaler of prescription drugs. Through its officers and employees it associated itself with First DataBank, Inc. ("First Data" or "FDB") and its officers or employees to form a RICO association-in-fact and to engage in a pattern of racketeering activity including multiple episodes of mail and wire fraud, all designed to increase the AWP for brand-name drugs. McKesson and its co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy to violate RICO and Virginia law. Individual defendant James was the principal architect of the fraud; individual defendant Yonko, James' direct supervisor, oversaw and approved of James' conduct relating to the scheme to defraud.

6. McKesson's deceptive practices and unlawful acts involved a scheme and course of conduct that directly resulted in the transmission and publication of false and misleading information concerning AWPs. These deceptions foreseeably resulted in injuries to the Commonwealth. Virginia Medicaid was forced to bear millions of dollars of excess charges arising from the Scheme and the fraudulent AWPs.

7. Based on an investigation of First DataBank's databases, the list of drugs covered by this lawsuit is attached as Exhibit A ("Marked Up Drugs").

8. In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals from wholesalers like McKesson on the basis of WAC, they

- 2 -

*get paid* (*i.e.*, get reimbursed) for branded drugs based on the benchmark commonly used for retail sales, *i.e.*, the *AWP*. As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

9.     The WAC is the most public price for a brand name drug and is typically reported on invoices and manufacturer price lists or catalogs. Manufacturers often do not publish AWPs, and the industry depends on publishers, like FDB, to provide them based on the historical markup associated with the manufacturers.

10.     Each year more than three billion prescriptions are written in the United States. The various actors in the marketplace must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are, therefore, compiled and published by publishing companies, including FDB and Medi-Span. Through these compilations, which are available in both hard copy and electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement accordingly.

11.     Consumers, health and welfare plans, health insurers and governmental entities, including state Medicaid programs and other governmental entities ("Payors"), who pay for prescription drugs use and rely on the AWP in doing so. Virtually all these entities had contracts for the brand-name drugs at issue that use AWP as a pricing standard.

12.     Additionally, defendants, FDB, and pharmacies knew that public payors, like Virginia Medicaid, utilize AWP as a pricing benchmark.

13.     Until it made the announcement on March 15, 2005, that it would no longer survey wholesalers to calculate AWPs, First Data publicly represented, with defendants' knowledge, that it derived the WAC mark-up that establishes the AWP either from manufacturers or by conducting "a survey" of wholesalers whose purpose was to verify prices reported by the manufacturer. FDB further represented that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing." On March 15, 2005, FDB announced that it would no longer track the AWP-WAC markups, but rather would apply the 25% markup allegedly "previously provided to First

- 3 -

1   DataBank through the wholesaler survey process."[1] FDB also deceptively claimed that brand drugs

2   had reached a "standardized markup of 25%" as "determined through a historical analysis of the

3   Blue Book AWP . . . during the years 2001-2004."[2] McKesson is one of the wholesalers that First

4   Data purported to "survey" as part of this process.

5       14.     Historically, in order to arrive at the AWP for branded drugs, manufacturers applied

6   a standard mark-up of either 20% or 25% to WAC. Prior to the scheme, whichever mark-up was

7   given to a particular brand line "stuck" with that drug indefinitely with the vast majority of brand

8   drugs being set at 20% markup over WAC.

9       15.     Defendants knew that 20% or 25% mark-ups were associated with particular

10  manufacturers or divisions of pharmaceutical companies.[3] In an official policy statement developed

11  in January 2002, drafted by defendant Yonko and arising out of discussions with defendant James,

12  McKesson expressly *disavowed any involvement* in determining markups and stated that it only

13  adjusted the price if there was a pricing action, that is, if the manufacturer changed its WAC.[4] It also

14  represented that it understood First Data to publish the AWP consistent with the manufacturers'

15  historic mark-ups.[5] None of this was true. Defendants worked behind the scenes to rig brand drug

16  prices to the detriment of payors everywhere, including state Medicaid agencies.

17      16.     For example, McKesson drafted a letter, dated August 10, 2000, to lobby Glaxo

18  SmithKline to increase its markup. McKesson explained: "Pricing and [p]harmacy

19  [r]eimbursement … is an area that McKesson … has no direct vested interest."[6] Its interest "is in

20  the long term health and viability of our mutual customers on the community pharmacy."[7] The 20

21

22      [1] MCKAWP 0054058.

        [2] *Id.*

23      [3] MCKAWP 0069611.

24      [4] "The markup … is for the most part determined by historical spreads from the manufacturer
        (not by McKesson). MCKAWP 0084296.

25      [5] *Id.*

26      [6] MCKAWP 0073551. Defendant Yonko was one of three recipients of an August 10, 2000
        internal e-mail, entitled "Letter to Glaxo SmithKline," and attaching the draft letter to then
27      McKesson Senior Vice President, Paul Julian. MCKAWP 0073549-51.

28      [7] *Id.*

- 4 -

COMPLAINT
001821-28 451449 V1

and 25% markups or 20 and 16⅔% spreads, "representing the difference between wholesale acquisition price (WAC) and average wholesale price (AWP), create the gross margin for pharmacy retailers under third party reimbursement plans." It concluded: "We would strongly support Glaxo SmithKline adopting a 20% spread [25% markup] policy for all of its products."

17.     Around mid-2000, knowing that FDB relied on the markup wholesalers apply on their projected retail prices, *i.e.*, suggested sell prices, to calculate the published AWPs, defendants made a decision to stop calculating McKesson's suggested sales prices according to the manufacturers' historic markup and instead to unilaterally adopt a higher markup.[8] In subsequent litigation, Defendant Yonko acknowledged that McKesson changed its markup to support its pharmacy customers in the hope that FDB would survey the artificial markup and increase the published price.[9] Multiple internal e-mails and memos from Defendant James also demonstrate that the changes were made not as a legitimate response to marketplace changes but as an artificial increase to benefit McKesson and its customers.[10]

18.     For example, in a March 22, 2002 memo to Yonko, James reports that "[i]n January of 2001 when Pfizer (20% spread [*i.e.*, 25% markup]) officially took over Parke-Davis (16 2/3 spread [*i.e.*, 20% markup]) we called Pfizer and asked what their position was relative to Parke-Davis spreads."[11] McKesson "huddled and made the decision to change all Parke-Davis products to a 25% markup to match the Pfizer products. This meant that our Suggested Sell prices for both product lines used the 25% markup. This had no immediate impact on the AWP. However, 12 months later when the next price increase was expected, FDB resurveyed the line and this resulted in increased AWP's on all of the Parke-Davis products[.]"[12] The impact of the price change was huge as it included the world's top-selling drug – Lipitor.

---

[8] MCKAWP 0069608.

[9] 5.15.07 Deposition of Greg Yonko ("5.15.07 Yonko Dep") 41:8-14.

[10] *See, e.g.*, MCKAWP 0065885.

[11] MCKAWP 0069608.

[12] *Id.*

- 5 -

1    19.    James further reports that McKesson "changed the markups ... on Alza's Concerta

2    products last June [2001] at the request of the manufacturer. They wrote ... a letter requesting this

3    action and we passed it along to FDB telling them that McKesson was going to honor this request

4    *and the changes were made*."[13]

5    20.    Encouraged by its ability to raise prices, James engaged in further discussions with

6    FDB to raise additional AWPs on McKesson's behalf. As a result of these discussions McKesson

7    and FDB secretly agreed to artificially raise and fix the AWP of hundreds of brand-name drugs and

8    therefore artificially raise prices in that market. James apprised Yonko of his discussions and the

9    agreement he had reached with FDB on or about the time they occurred.[14] Yonko tacitly or

10   expressly approved of James' conduct.[15] Nor were their discussions limited to these individual

11   defendants. Both James and Yonko discussed James' efforts with other officers and employees at

12   McKesson, and even referenced it in McKesson's monthly status reports for Rx Brand Product

13   Management.[16] As illustrated herein, many officers and employees approved the plan and James

14   frequently bragged about its success, including it for example in his April 22, 2003 memo to Yonko

15   re "FY03 List of Accomplishments and Development."[17]

16   21.    March 2002, James also recaps that: "After a discussion with FDB last August

17   [2001], *we mutually agreed to standardize*[] the Searle (16 2/3% spread) product line.... In

18   December, after several discussions with FDB about our business efficiency improvement strategy

19   we began to move many of the manufacturers with mixed AWP spreads (16 2/3 % and 20%

20   products in the same line) to a consistent 25% markup. These were companies like

21   GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol Meyers Squibb, Merck, JOM, and 3M,

22   Forest, Novartis, Roche, Schering, and several others."[18] The scheme expanded to cover all brand

23

24       [13] *Id.* (emphasis added).

25       [14] MCKAWP0065885. Yonko responds to James' e-mail report: "Let's discuss." *Id.*
         [15] *See, e.g.*, MCKAWP0065883; MCKAWP 0065592; MCKAWP0084300.

26       [16] MCKAWP 0066191-92 (October 2002) and MCKAWP 0071670 (December 2002).

27       [17] MCKAWP 0065592.

28       [18] MCKAWP0069608 (emphasis added).

- 6 -

COMPLAINT
001821-28 451449 V1

1  name drugs.[19] Defendants' solicitation and active encouragement of the price changes at FDB

2  continued well into 2004.[20]

3      22.    Until March 2005, FDB represented that it used the survey method to verify the

4  accuracy of its pricing information. However, in late 2001, knowing that it would profoundly

5  impact the market, McKesson and First Data agreed, without any legitimate economic justification,

6  to raise the WAC-to-AWP markup on brand-name drugs that previously had received only the 20%

7  markup amount. The Scheme affected over 400 brand name drugs. To draw attention away from

8  the markup increases, McKesson and First Data agreed to typically effectuate price changes only

9  when some other WAC-based price announcement was made by a drug manufacturer. This

10  camouflaged both the associated increase in the WAC-to-AWP markup and WAC-to-AWP spread

11  and McKesson as the source of the increased markup. McKesson communicated these new WAC-

12  to-AWP markups to First Data. First Data, without regard to any change in the actual average

13  wholesale prices occurring in the pharmaceutical marketplace, and without reference to the

14  manufacturers' suggested AWPs (or WACs) for these drugs, and without surveying other

15  wholesalers, then published new AWPs with the new WAC-to-AWP markup. First Data did so

16  despite receipt of information, in some instances, directly from manufacturers specifying or

17  suggesting a 20% markup as appropriate. On some occasions, some of the manufacturers discretely

18  questioned this increase, but First Data refused to change the published AWP and the manufacturers

19  failed to take any action to remedy First Data's unjustified raise in AWP.

20      23.    The dramatic nature of the Markup Scheme is illustrated by the following chart

21  depicting the hundreds of drugs whose WAC-to-AWP mark-up was raised as part of the Scheme.

22  The spike in 2002 reflects implementation of the Markup Scheme:

23

24

25

26

[19] *See, e.g.,* MCKAWP 0069615.

27  [20] *See, e.g.,* MCKAWP 0070967 (e-mail from McKesson to FDB asking whether Prilosec over-
28  the-counter could be considered like the prescription product with a 25% markup).

- 7 -

COMPLAINT
001821-28 451449 V1

1

2

3

4

5

6

7

8

9

10

11

12



**Number of NDCs with Markup Change from 20% to 25% Jan. 1999 - Oct 2004**

13

14

15

16

17

18

24. Once defendants and First Data raised the WAC-to-AWP markup to 25% on a given drug, that markup remained in place until September 26, 2009, when a settlement of a class action lawsuit brought by third party payors against McKesson and First Data resulted in a "rollback" of the wrongly inflated markups. This rollback merely returned prices to where they should have been absent defendant's wrongful conduct: McKesson did not compensate the Commonwealth for the many millions of dollars in damages caused by this conduct.

19

20

21

22

23

24

25

26

25. Defendants had an economic incentive for implementing the Scheme. McKesson's principle customers consist of national retail chains, independent pharmacies and institutional healthcare providers, such as hospitals.[21] Those customers included some of the largest retail chains in the country: A&P, Albertsons, Brooks, Costco, Eckerd, Giant Eagle, Hy-Vee, Kinney Drugs, Long's Drugs, Rite Aid, Safeway, Randall's Shopko, Snyders, Spartan, Super D/USA Drug, Target, Walmart, Walgreens, and Wegmans.[22] Rite Aid's 2001, 2002 and 2003 annual reports all

27

28

---

[21] McKesson Corporation's March 31, 2008 10-K at 3.

[22] MCKAWP 0074408.

- 8 -

1  described the importance of its relationship with McKesson.[23] For example, in 2001 Rite Aid

2  reports pharmacy sales make up 59.5% of Rite Aid's total sales, of which "93% of our

3  pharmaceutical supplies" come from McKesson.[24]

4  26.  Defendants implemented this Scheme in order to provide a benefit to those important

5  retail pharmacy clients. Pharmacies are reimbursed by Plaintiff based on AWP. Consequently,

6  pharmacies make a profit on the spread between AWP and their acquisition cost for a drug. Under

7  this system, a higher WAC-to-AWP mark-up results in increased profits to pharmacies. Thus, an

8  increase in the WAC-to-AWP mark-up results in larger profits for retailers.

9  27.  Like most wholesalers, McKesson sold drugs at or below its own cost, and

10  McKesson recognized that it could distinguish itself from other wholesalers by providing a more

11  enhanced relationship with customers.[25] Although defendants knew the importance of keeping their

12  activities confidential, they also realized that, in James' words, McKesson could "'market' [its]

13  efforts" by carefully informing its customers that it was "doing everything possible to 'raise' AWP's

14  when appropriate."[26] McKesson also appreciated that, if it failed to inform its customers that it was

15  behind all these changes, "it's possible that some of these accounts will believe that this stuff just

16  happens and the efforts will go unrecognized."[27] As one McKesson executive put it: "This sounds

17  like something we should at least [be] quietly communicating to our customers in order to get some

18  mileage from it[.]"[28] Defendant Yonko affirmed: "I also think we should start communicating any

19  AWP changes so customer[s] know what's going on, the end result should be beneficial."[29]

---

22  [23] Rite Aid 2001 Annual Report at 27; Rite Aid 2002 Annual Report at 25-26; Rite Aid 2003
23  Annual Report at 32.

[24] Rite Aid 2001 Annual Report at 27.

24  [25] *See* John Bonner Dep. at 12:20-23 (acknowledging that wholesalers sell at or slightly below
25  cost).

[26] MCKAWP 0065895.

26  [27] *Id.*

27  [28] MCKAWP 0069732.

28  [29] MCKAWP 0084300.

- 9 -

COMPLAINT
001821-28 451449 V1

28.     McKesson was proud of its efforts and discretely boasted to select retail clients that McKesson "had been working on AWP expansion with some success."[30] Internally James noted that clients were "very glad that McKesson was doing this."[31] Confirming the secrecy of the Scheme, he cautioned that McKesson's "AWP expansion effort" and information about its role in inflating AWP is "NOT INTENDED to be handed out to customers" but could be described to show "McKesson is doing our part."[32] "AWP expansion," like AWP "normalization" was defendants' euphemism for the WAC-to-AWP price fix.

29.     First Data agreed to this Scheme to ease the burden of having to establish accurate spreads and to maintain the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP, even though First Data knew that it no longer had the industry contacts and cooperation necessary to ensure accurate pricing. Thus, First Data and McKesson shared multiple common purposes, though they may have had different reasons for doing so, and each acted to achieve those purposes by implementation of the 5% Scheme.

30.     Virginia Medicaid's pharmaceutical payments were tied to published AWPs. Like nearly all State Medicaid programs, Virginia's Medicaid program utilized AWPs provided by McKesson's co-conspirator First Data.

31.     As a result of this artificial increase in the mark-up of the WAC from 20% to 25%, Virginia Medicaid's drug prices were increased.

32.     Among the drugs whose prices were artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anti-coagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on prescription drugs annually, a 5% increase in the WAC-to-AWP mark-up results in a substantial

[30] MCKAWP 0069726.

[31] MCKAWP 0069726.

[32] MCKAWP 0069732 (emphasis in original).

- 10 -

1  increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales in

2  2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP mark-up results in an increase of

3  over $100 million per year in reimbursements for just one drug. Another such drug is Pfizer's

4  Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase imposed

5  by First Data and McKesson, hundreds of millions per year was spent on Lipitor that would not

6  have been absent the Scheme.

7      33.    In this action, Plaintiff seeks to recover damages incurred resulting from defendants'

8  unlawful acts and practices, as well as civil penalties, the costs of litigation including attorneys'

9  fees, and all other relief authorized by law. Plaintiff asserts claims against McKesson for violations

10  of federal racketeering and the Virginia's Fraud Against the Taxpayer Act, and against all

11  defendants for violations of Virginia's Fraud Statute and common law fraud.

## II.    JURISDICTION AND VENUE

13      34.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

14  § 1331 (federal question) and 18 U.S.C. § 1964 because certain claims in this action arise under the

15  Racketeering Influenced and Corrupt Organizations Act, § 1962, *et seq*. Subject matter jurisdiction

16  over the state law claims is proper in this Court pursuant to 28 U.S.C. § 1367(a) because such

17  claims are so related to the claims in this action within the Court's original jurisdiction that they

18  form part of the same case or controversy under Article III of the United States Constitution.

19      35.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants

20  reside in the State of California and a "substantial part of the events or omissions giving rise to the

21  claim[s] occurred" in this District.

22      36.    Venue is thus also proper under RICO's special venue provision, 18 U.S.C.

23  § 1965, as Defendants transact business in the State of California.

24      37.    This Court has personal jurisdiction over the parties because Plaintiff submits to

25  the jurisdiction of this Court, and because defendants reside in the State of California, transact

26  business in California, and systematically and continually conduct business throughout

27  California. Additionally, McKesson's unnamed coconspirator, First Data Bank, also resides in

28

- 11 -

1 │ the State of California, transacts business in California, and systematically and continually

2 │ conducts business throughout California.

3 │ 38. Assignment to the San Francisco or Oakland division of this Court is appropriate

4 │ because Defendant's headquarters and principal place of business is San Francisco, California.

5 │ Because this action arises in the county of San Francisco, pursuant to Northern District of

6 │ California, Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland

7 │ Division is proper.

8 │ ### III. PARTIES

9 │ 39. Plaintiff Commonwealth of Virginia, through the Virginia Department of Medical

10 │ Assistance Services, administers the Virginia Medicaid program. Virginia Medicaid provides

11 │ health coverage to some low-income Virginia residents, including families with children, pregnant

12 │ women, medically needy individuals, the elderly, and people with disabilities. Much of the

13 │ Medicaid budget, which is comprised of federal and state funds, is devoted to these health care

14 │ programs. Through the Medicaid program, the State pays all or part of enrollee's medical benefits,

15 │ including prescription drugs.

16 │ 40. Defendant McKesson Corporation is a Delaware corporation with its principal place

17 │ of business at McKesson Plaza, One Post Street, San Francisco, California 94101. McKesson

18 │ claims to be the leading provider of supply, information and care management products, and

19 │ services designed to reduce costs and improve quality across healthcare. Founded in 1833, with

20 │ annual revenues of more than $100 billion, McKesson ranks as the 14th largest industrial company

21 │ in the United States.

22 │ 41. Defendant Robert James is McKesson's Vice President of Brand Product

23 │ Management and was the chief architect of McKesson's scheme.

24 │ 42. Defendant Greg Stephen Yonko is McKesson's Senior Vice President of Purchasing

25 │ and Pharma Finance. At all times relevant to this lawsuit Yonko directly supervised James,

26 │ including his participation in the scheme alleged in this lawsuit. Yonko was aware of the benefits

27 │ that it would provide to McKesson and approved of the scheme.

28 │

- 12 -

COMPLAINT
001821-28 451449 V1

43.    McKesson's unnamed co-conspirator is First DataBank, Inc., a Missouri corporation with its principal place of business at 1111 Bayhill Drive, San Bruno, California 94066. First Data is a subsidiary of the Hearst Corporation and is the leading provider of electronic drug information to the healthcare industry. For the period of 1998 through about January 2002, when it agreed to divest, Hearst Corporation jointly operated First Data and the only competitor in the electronic drug pricing market, Medi-Span. As part of the divestiture agreement, First Data provided its drug price information to Medi-Span until approximately October 2004.

## IV.    STATEMENT OF FACTS

44.    This case involves the artificial increase in the "mark-up" factor between the so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or "AWP") of a large number of brand-name prescription drugs, a scheme first implemented in late 2001 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most widely used and "trusted" electronic drug data publisher). Individual defendants James and Yonko were the principal McKesson agents to facilitate the scheme.

### A.    Drug Manufacturers and NDCs

45.    Drug makers manufacture brand-name and generic drugs. Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug. After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand-name drug itself remains with the original manufacturer. Drug products not covered by patent protection and produced and/or distributed by many firms are referred to as generic drugs. Manufacturers tend to be either brand-name drug manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

46.    There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients primarily through four different drug distribution channels: (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion (*i.e.*, drugs

1  administered into the patient's bloodstream); and (d) other medical providers. This lawsuit

2  primarily involves branded drugs distributed through the first channel, the retail pharmacies.

3  47.   All drugs intended for retail pharmacy sale are identified by an eleven-digit National

4  Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA").

5  The NDC is used to identify the drug delivered to the patient. The first five digits of the NDC show

6  the identity of the company that manufactured and/or packaged the drug, the middle four digits

7  identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*,

8  whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000

9  active NDCs, many more NDCs have been issued over time (over the years many drugs and

10  associated NDCs have been phased out).

11  **B.    The Wholesale Acquisition Cost**

12  48.   Branded manufacturers arrive at an original launch price by taking into account

13  research and development costs, launch and marketing costs, competitor prices and estimates of

14  consumer and physician demand. Generic makers, of course, generally use commodity pricing

15  approaches. Once an introductory price has been set, the branded manufacturer establishes the

16  wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject

17  to many adjustments). The WAC for branded drugs is then published by the manufacturer.

18  49.   Manufacturers establish the WAC as a baseline for wholesale sales. Thus, while

19  WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through

20  volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may

21  receive other price concessions charged back to the manufacturers), it is the baseline for branded

22  drug sales by manufacturers to national wholesalers. In addition, WAC is a publicly available price

23  for most branded drugs. It is the closest reported price to the actual transaction price between a

24  manufacturer and the wholesaler or other direct purchaser of a drug product. Because the

25  wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC,

26  a change in WAC generally results in a similar percent change in price to both wholesalers and to

27  retail pharmacies.

28

- 14 -

50.     WACs are typically reported on invoices between the manufacturer and the drug wholesaler.  Some drug manufacturers have other names for the WAC price such as manufacturer list price, catalog price, direct price, wholesale net price, or book price.

## C.     The Average Sales Price

51.     After all price concessions are considered, a drug manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler.  The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

52.     Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products.  The average of those net sales prices is usually called the average sales price (or "ASP").  While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.  Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria.  Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers.  As a result, for retail pharmaceutical products the exact relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug, at a particular point in time, is not publicly known.

## D.     The Average Wholesale Price

53.     In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be published an average wholesale price (or "AWP") for prescription pharmaceuticals.  The average wholesale price or AWP is a list price used for invoices between drug wholesalers and pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered drugs) and, is typically used as a benchmark for the reimbursement by end payors to dispensers (such as retail pharmacies or

- 15 -

doctors) for drugs provided to patients. Historically, the AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in effect until a change in price is published.

**E.     The WAC-to-AWP Spread**

54.     In the pharmaceutical industry, the percentage by which the AWP exceeds the WAC is sometimes known as the "mark-up" for a particular drug product.

55.     The amount of the AWP that represents the mark-up is known as the "spread." For example, a drug with a 25% mark-up (for instance from a WAC of $100 to an AWP of $125) has a spread ($25 of the $125 AWP) of 20%.

56.     For many years preceding the Scheme alleged in this Complaint, the WAC-to-AWP mark-up for branded drugs had predictably-set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for those patterns. For branded pharmaceuticals, the WAC/AWP mark-up for a particular manufacturer or brand-line tended to fall in two quantum places: 20% or 25%. If a particular NDC first launched at a 20% mark-up value, that NDC would remain as a 20% drug during the entire lifetime of that NDC, almost as if it were part of the genetic code for that NDC. Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same mark-up factor associated with that NDC. *Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP mark-up to be changed for any particular NDC.*

57.     Due to the *unchanging* nature of the WAC/AWP mark-up for a particular NDC, these standard 20% and 25% WAC/AWP mark-up factors were commonly associated by McKesson, First Data, and others in the pharmaceutical industry with particular divisions of pharmaceutical companies. Prior to the scheme, a pharmaceutical division would be known as a "20% mark-up" company, while another company was known as a "25% mark-up" company.

**F.     Drug Wholesalers**

58.     Branded manufacturers' primary customers are wholesalers, although they may also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

- 16 -

59.     Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

60.     The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a price close to or at WAC, however, there is often a volume discount or early cash payment discount off that price.

61.     National wholesalers are the primary intermediate level in the distribution process retail channel. They accounted for 45.7% of prescription drugs ($98.5 billion) in 2002. Other intermediate channels of distribution included chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers were made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

62.     Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively, they account for more than 80% of drug sales that flow through drug wholesalers (national, regional, and specialty).

**G.     Wholesaler Sales Transactions**

63.     National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail order businesses). As a result, drug wholesaler margins to retailers tend to be thin, with a significant portion of national drug wholesaler revenue instead being derived from prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

- 17 -

64. National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

## H. Retail Pharmacy Channel

65. The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market share of dollars for prescription drugs. Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass-merchandiser chains) purchase drugs (primarily generics) in large enough volumes so that they can bypass the wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

66. Regardless of whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

67. When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates for selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing uses the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

68. Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power. Some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from wholesalers,

- 18 -

resellers and manufacturers, the starting benchmark for transactions is the WAC, but, again, the
actual transaction cost is highly variable due to the additional arrangements.

69.     In short, entities in the retail distribution chain (including wholesalers, resellers
(retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase
brand-name drugs based upon WAC. While the actual transaction purchase price varies from the
WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the
retail distribution chain acquire branded drugs.

**I.      The Private End Payors for Prescription Drugs**

70.     At the most basic level, prescription drug expenditures are funded by either private or
public sources. In 2008, the sale of prescription drugs was a $291 billion dollar a year business in
the United States. Much of this is privately funded.

71.     Private payors for prescription drugs include drug benefit plan sponsors and
consumers. The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs
for their covered beneficiaries) include self-insured employers, health and welfare plans, health
insurers and managed care organizations ("MCOs"). Most of these plan sponsors reimburse
retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health
plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies
and rebates from drug manufacturers. The vast majority of such purchases are for out-patient drugs
that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

**J.      End Payors' Drug Reimbursements are AWP-Based**

72.     The WAC-AWP relation of brand name drugs is fundamental to retail pharmacies'
business. Although retail pharmacies ***purchase*** pharmaceutical products based upon pricing
formulae that employ the WAC, they ***get paid*** (*i.e.*, receive reimbursement) from plan sponsors and
consumers based upon an AWP reimbursement formula plus a dispensing fee.

73.     Health plans typically contract with intermediaries called pharmacy benefit managers
("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the
numerous transactions that occur during the administration of a plan. Although the PBM negotiates
prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and

- 19 -

welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies' drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

74. Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank…." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

75. The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged. For example, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector." Those paying for drugs, by statute or contract, rely on and use the published AWP.

76. Third-Party AWP-based reimbursement has also been acknowledged by defendants. For example, in a September 2001 e-mail to Yonko and others at McKesson, James internally noted that "it is important to understand that the AWPs that are used for third party reimbursement are the First Data Bank (FDB) AWPs."[33]

77. In summary, thousands of pharmaceutical reimbursement contracts are based on AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates. All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and

---

[33] MCKAWP 0068514.

COMPLAINT
001821-28 451449 V1

private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP." Public and private payor reliance on AWP was well known to McKesson.

**K.     Like Most Medicaid Agencies, Virginia Medicaid Reimburses Brand Drugs Based on AWPs**

78.     Public purchases for prescription drugs provide a variety of programs for low-income and elderly patients, veterans, members of armed services, and federal, state and local government employees.  These public payors also rely on and use AWP as a basis for reimbursement to pay for dispensers' ingredient costs for branded pharmaceutical products.

79.     Medicaid has the most significant impact on prescription drug pricing for out-patient drugs.  The Medicaid Program, jointly financed through federal and state funds, is designed to aid certain low-income people and the disabled, and covers about 40 million individuals.  Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-for-service part of the program increased at an average annual rate of 18%, going from $10.2 billion to $23.4 billion.  (While these are significant sums, they amount to less than 10% of the overall annual prescription drug expenditure.)

80.     Medicaid's reimbursement system relies upon the published list prices of drugs (which are largely directly set by manufacturers) to determine pharmacies' reimbursement.  States reimburse pharmacies using formulas that are typically based on the average wholesale price or AWP of a drug.  For example, a state might reimburse a pharmacy 85% to 90% of the average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to cover the pharmacy's other costs.

81.     Virginia routinely provides prescription drug coverage as part of its Medical Assistance Program for medical assistance to the poor, needy, elderly and disabled.  Included in that coverage are payments for drug products, including both single source drug products (brand-name drugs) and multi-source drug products (generally generic drugs), that are delivered to the patient either by providers including pharmacies and physicians incident to their services.

- 21 -

82. During all relevant times covered by the Complaint:

    (a) Virginia relied on FDB as its primary source of pricing data and has utilized reports of AWP, Direct Price, and the Federal Upper Limit ("FUL") supplied by FDB.

    (b) At defendants' direction, FDB reported inflated and fraudulently derived AWPs for over 400 brand name prescription drugs.

83. Defendants caused to be reported false or misleading prices to Virginia's Medicaid program by providing false or misleading price information to FDB with knowledge that such false and misleading price information would be used for the processing of claims by the Commonwealth of Virginia.

**L.    Medicare Drug Reimbursements are AWP-Based**

84. The other significant public purchaser for prescription drugs is the federal Medicare Program.

85. Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self-administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover approximately 450 drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.

86. Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% "co-payment" amount is paid by the Medicare Part B beneficiary. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. Moreover, before Part B benefits are payable, beneficiaries under Part B are required to pay an annual deductible amount.

87. Some Medicare beneficiaries can purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

88. Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statute and implemented by regulation. Beginning in 1998 and until recently,

- 22 -

Medicare reimbursed for drugs and biologicals under its program of the reimbursing physician-administered drugs based upon 95% of the published average wholesale price.

89.     At the end of 2003, Congress enacted the Medicare Modernization Act.  Among other things, the Act changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturer's actual calculation for the average sales price for each drug or biological covered by the program.  Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP.  Beginning in 2004, Medicare has been transitioning to an ASP-based reimbursement system.

90.     In summary, the two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare area).

**M.     PBMs**

91.     Third-Party Payors ("TPPs") do not typically look at AWP-WAC but look instead to overall price trends.  This is because most TPPs do not negotiate directly with retail pharmacies to set their rate of reimbursement, but contract with Pharmacy Benefits Managers ("PBMs"), who act as the middlemen between TPPs and pharmacies.  But PBMs make very little money processing TPP claims and look to other sources for generating revenue.  For example, in its 2005 Annual Report, Express Scripts, Inc. reported that it received 35% of its revenue from mail order operations compared to 1% from services offered to TPPs.[34]  Similarly, in its 2005 Annual Report, Medco identified client services as less than 1% of its overall revenue, while its mail order business accounted for 37%.  One observer recently explained the evolution of PBM services and competition as follows:

> Initially, the goal of the PBM was to simplify the administration of benefits for health plan members and to provide some cost-management services…. In the early 1990s, as electronic point-of-sale (POS) claims processing became prevalent, PBMs began to shift their dependence on revenue from claim processing to other sources, including manufacturer rebates, selling data to manufacturers, and

---

[34] Express Scripts 2005 Annual Report.

COMPLAINT
001821-28 451449 V1

selling mail order and retail drugs. PBMs found that health plans and
employers were more interested in lower administrative fees, because
the result of pharmacy-cost reduction appeared to be too difficult to
measure. This practice created a price war among PBMs for business
from large health plans and resulted in a perception of POS pharmacy
claims as a commodity…. *Gradually, the PBM industry shifted to
aggressive strategies of seeking revenues from alternative sources to
compensate for selling benefit administration services at lower costs.*
PBMs that could not buy or build mail order capabilities quickly
turned to other revenue sources. These included the sale of claims
data to drug manufacturers and repricing of the retail network, known
as spread pricing (fees gained through continual negotiation of lower
rates with the pharmacy network that are not passed on to the health
plan or employer). *Today, revenue from POS claims processing
provides little to no margin for PBMs.*[35]

92.     Mail order services are a particularly lucrative source of revenues for PBMs. In their

mail order capacity, PBMs stand in the same shoes as McKesson's retail pharmacy clients by

profiting from the AWP increase. Thus, PBMs had a strong incentive to remain silent about the

Scheme or risk losing additional profits stemming from new mark-ups, and they did so. For

example, a 2002 internal email from PBM giant, Express Scripts, discussing the markup increases,

remarks: "The good news is that the AWP increases being pushed through by First Data Bank is

having a very favorable impact on our mail margins. (We are actually making money on Aetna!!!)

The bad news is that the clients' drug trends are going to be terrible."[36] The executive predicted that

"[o]ur clients will not be sympathetic to our financial situation since we will have benefited from the

AWP increase in the mail and they hired us to control drug trend. Our relative good fortunes could

turn into a significant misfortune if we are not prepared."[37] Stuart Bascomb, Express Scripts'

Senior Vice President in charge of Sales and Account Management and the second in command in

the company, responds: "Lets [sic] put a lid on it and not make a big deal."[38]

---

[35] Steve Martin, "PBM Industry Today: Who's Managing Drug Costs?," *Managed Care Magazine*, Dec.
2001, http://www.managedcaremag.com/archives/0112/0112.pbmfuture.html, accessed August 29, 2007
(emphasis added).

[36] ESI-414-00005439. ESI predicted FDB rollback would have a material effect on its mail
order operations. *See* ESI 2006 Annual Report ("In the absence of any mitigating action on our
part, the proposed reduction in FDBs [*sic*] AWP should have a material adverse effect on the margin
we earn on home delivery transations.").

[37] ESI-414-00005439.

[38] ESI-414-00005438.

COMPLAINT
001821-28 451449 V1

**N.    Usual & Customary (uninsured) Payors**

93.    Additionally, there is a significant portion of the population who are uninsured or underinsured and who pay for drugs in cash. This is referred to in the industry as the usual and customary ("U&C") charge.

94.    U&C payments are tied to the reported AWPs, and are usually set at a price above AWP or at a minimum above the pharmacy's AWP-based Third-Party reimbursement formula. Hence, an artificial increase in the AWP uniformly impacts such consumers.

95.    These are the most vulnerable of all consumers purchasing drugs. They have no power to negotiate discounts.

**O.    The Brand Drug Pharmaceutical Market was Conducive to the Scheme**

96.    The market for brand-name prescription drugs has a number of features that facilitated the implementation of the Scheme alleged in this Complaint. The industry relies almost exclusively on electronic publishers for the source of AWPs, especially First Data. Additionally, for the period of 2001 through late 2004, First Data and Medi-Span acted as one for the purposes of calculating and publishing AWPs. As James acknowledged in an e-mail to Yonko and several other McKesson employees: "This means that essentially the Medi-Span data is the First DataBank data."[39] First Data was therefore the industry standard bearer for both AWP, and by implication, AWP-WAC mark-up. Changes at First Data would affect prices throughout the industry.[40]

97.    The effects of the scheme were also difficult to detect. Because WAC-AWP ratios had historically remained constant, payors had no reason to track them. Further, the overall rise in drug prices over the same period dwarfed the subtle impact of the scheme. A federal judge in the District of Massachusetts, reviewing the scheme's impact on Connecticut Medicaid, recently concluded:

> As shown in Figure 1 from Dr. Hartman's declaration, the "impact of the scheme" was minimal compared to drastic increases in drug pricing for all drugs, including drugs not at issue in this case.

---

[39] MCKAWP 0057171; MCKAWP 0057415.

[40] MCKAWP 0057171.

- 25 -



*In re McKesson Governmental Entities Average Wholesale Litig.*, 2011 U.S. Dist. LEXIS 22210, at
*28 (D. Mass. Mar. 4, 2011) (black and white graph reprinted in original color format submitted to
court).

**P.    Private and Public End Payors Rely on Published Drug Pricing Compendia**

98.    The private and public pharmaceutical reimbursement systems depend upon accurate
and timely publication of the AWP, for drugs dispensed by retail pharmacies. Private (and public)
reimbursement systems, including the plan sponsors and consumers who reimburse drug dispenser
costs, and also rely upon pharmaceutical pricing publishers to accurately and fairly publish AWPs
and WACs for NDCs. Defendants and FDB were aware of this reliance.

99.    Several pharmaceutical industry compendia periodically publish the AWPs for active
NDCs in the United States. Generally these publications are available in either hard copy format or
in electronic media.

100.    Generally speaking, the two printed compendia include Drug Topics Red Book (the
"Red Book") (published by Thompson Healthcare) and American Druggist First DataBank Annual
Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for
several years has been defunct). While the Red Book is used to determine published AWPs
(primarily for physician-administered drugs), and while certain limited electronic information is

- 26 -

COMPLAINT
001821-28 451449 V1

1  available regarding Red Book published prices, the Red Book remains primarily an annual printed

2  publication with periodic printed updates.

3      101.    In periodically announcing the AWP for each drug, publishers generally report prices

4  that are supplied to them by manufacturers for their respective drugs. For instance, the foreword to

5  the 1999 edition Red Book states that "all pricing information is supplied and verified by the

6  products' manufacturers, and it should be noted that no independent review of those prices for

7  accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil

8  Southerd, an associate product manager of the Red Book, stated that Red Book only publishes

9  prices that are faxed directly from the manufacturer.

10  **Q.    The Emergence of First Data and Medi-Span as Electronic Data Publishers**

11      102.    In addition to printed publications of pharmaceutical prices, the AWP for NDCs is

12  also widely made available to manufacturers, wholesalers, retailers (including major chain

13  pharmacies, independents, mail orders), pharmacy benefit managers and Third-Party Payors (*i.e.*,

14  plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers)

15  through large electronic drug databases.

16      103.    Drug databases started back in the mid-1970s with the advent of significant drug

17  benefit programs. These programs, along with the pharmacists who are dispensing the drugs and

18  the Third-Party Payors (primarily insurance companies) who are paying for them, needed

19  comprehensive and accurate descriptive and pricing information to ensure the accuracy of the

20  claims they were paying.

21      104.    The processing of claims became a massive job as drug prescriptions increased. The

22  need for a consistently accurate and comprehensive drug price database became a major need. As

23  First Data documents acknowledge, the "specter of inaccurate drug prices drove the database

24  companies to develop techniques to assure the accuracy and comprehensiveness of the data."

25      105.    During the 1990s, there were only two major electronic drug database companies:

26  (1) First Data, which describes itself as "started as the only purely electronic database company;"

27  and (2) Medi-Span, which had its roots in the printed drug price catalog business.

28

- 27 -

106. The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF." The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs. Among many other pieces of quantitative and non-quantitative information contained in the NDDF are the current and historical WAC, (known in the NDDF as the wholesale net price, or "WHN") and AWP, (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

107. The principal electronic database products sold by Medi-Span are based upon its Master Drug Database Files, or "MDDF." The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and historical WAC, and AWPs. Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

108. Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and Public Payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use intragratable drug data files to determine Public Payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

109. Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate

- 28 -

1   reference would be more time-consuming and would increase the risk that a harmful drug

2   interaction would not be detected until after the patient purchased and used the drug.

3       110.    During the 1990s and up to 1998, First Data and Medi-Span were substantial, direct

4   competitors within the relevant market of intragratable drug data files in the United States. They

5   faced little or no competition from other firms. Until 1998, two electronic drug databases – First

6   Data's NDDF and Medi-Span's MDDF – played the integral role in essentially all electronically-

7   based drug reimbursement transactions in the United States. They accounted for billions of

8   transactions each year and many billions of dollars of payments.

9       111.    Of course, First Data's NDDF and Medi-Span's MDDF both contained critical price

10  point data fields for the approximate 65,000 NDCs then active in the marketplace.[41]  The retail class

11  of trade relies on these systems and uses the AWP for the associated NDC when seeking

12  reimbursement for drug ingredient cost.

13  **R.      The Merger of First Data and Medi-Span Systems**

14      112.    In 1998, First Data's parent company, the Hearst Corporation, purchased Medi-Span

15  and merged it with First Data. After the merger, First Data began the process of combining its

16  NDDF with Medi-Span's MDDF (resulting in a product sometimes known as NDDF Plus).

17  Through this process, the Hearst Corporation caused First Data to become the sole United States

18  provider of intragratable drug data files, including the publication of electronic drug database

19  pricing information such as the WAC and associated AWP for branded pharmaceutical products.

20  Thus, beginning in or around 1998, virtually every participant in the pharmaceutical distribution

21  chain who used electronic database systems in undertaking reimbursement transactions for billions

22  of dollars of pharmaceutical products used and relied upon the accuracy of data from First Data's

23  NDDF and MDDF, including the published WAC and AWP price fields.

24      113.    After a lengthy investigation, the Federal Trade Commission brought suit against the

25  Hearst Corporation and First Data in 2001, claiming, among other things, that the First Data and

26  Medi-Span merger had been unlawful. Shortly thereafter, the Hearst Corporation agreed to divest

27  ───────────────

    [41] First Data's NDDF also contains historical information, and thus it contains data for almost 200,000
28  NDCs since many are no longer active in the marketplace.

- 29 -

COMPLAINT
001821-28 451449 V1

1    its Medi-Span assets, culminating in a consent decree late that year. But by this time, First Data's

2    merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated

3    over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of the

4    Medi-Span assets, First Data was required to provide the purchaser of the Medi-Span assets with

5    transitional and editorial services for many years into the future.

6        114.    As a practical matter, pricing data contained in both the NDDF and the MDDF post-

7    divestiture remained the same. Since 1998 and despite the late 2001 divestiture, First Data has

8    functioned as the sole editor of data populating the only available comprehensive intragratable

9    electronic drug data systems (the NDDF and the MDDF) for branded drug pricing information used

10   in the United States for reimbursement transactions in the retail pharmacy channel.

11       115.    All changes in First Data's electronically published AWPs and WAC-to-AWP

12   spreads were the same. The consent decree that implemented the Medi-Span divestiture from FDB

13   required that FDB continue to provide Medi-Span with all FDB pricing information until Medi-

14   Span (now called Facts and Comparisons) could develop its own pricing production system. Thus,

15   during the time period including August 1, 2001, until late 2004, when the Scheme effectuated an

16   increase in First Data's published spread, this increase also occurred in Medi-Span's published

17   prices and has remained in effect through the present. Defendants knew this would be the

18   consequence of their Scheme.

19       116.    During the 1990s and up to the end of 2001, both First Data and Medi-Span

20   maintained the historical proportion between AWP and WAC when branded price increases were

21   announced. This enabled the publishers (when receiving, for example, information only regarding

22   WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result,

23   the marketplace had predictability, and marketing pricing dynamics adjusted according to that

24   expected practice.

25   **S.    First Data Gains the Trust of the Pharmaceutical Industry**

26       117.    Before this and related litigation against McKesson began, pharmaceutical end

27   payors operated on the belief that the AWPs were the result of both honest reporting by

28   pharmaceutical companies, with respect to the publication of their WACs or submission of their

- 30 -

suggested AWPs to publishers, and an empirical and professional analysis undertaken by First Data or Medi-Span.

118.    The reliance upon the accuracy and legitimacy of First Data's data was not only known to First Data, but was the foundation of its business model, marketing, and promotion plans. For example, First Data stated:

> For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making.

> Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.

> [First Data:] A partner you can trust.

> Trusted Drug Knowledge…Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the timely, accurate information they need to support their clinical and business decision-making.

119.    First Data promoted its pricing information as "accurate," of "high-quality," and as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive, pricing and clinical information on drugs." It also recognizes that its pricing information is "relied upon by professionals in th[e] industry," and that, "*[t]o be useful to its audience, First Data's data must be accurate and up-to-date.*"

120.    Throughout the 1990s, First Data gained the trust and reliance of participants in the pharmaceutical marketplace – most notably pharmacies and the Third-Party Payors that reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

121.    Throughout this time, First Data knew, of course, that the primary purpose of publication of the WAC and of the AWP, and of the associated WAC-to-AWP mark-up (embedded in the difference between the AWP and WAC data fields), was to serve as an electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible." As First

- 31 -

1    Data stated: "AWP represents the average wholesale price; the average price a wholesaler would

2    charge a customer for a particular product. The operative word is *average*. AWP was developed to

3    provide a price at which all parties could agree upon for electronic processing to be possible."

4    122.    First Data's representations regarding the accuracy of its electronic publication of

5    AWP were highly successful. By 1998, after its acquisition of its only competitor, Medi-Span, First

6    Data was the sole provider of comprehensive, intragratable electronic data files providing AWP

7    information throughout the retail pharmacy distribution chain, including most private Third-Party

8    Payors. Of course, First Data made this known when marketing its products, stating that it

9    "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most Blue Cross Blue

10   Shield Plans, wholesalers and approximately 49 Medicaid programs."

11   123.    As part of its standard licensing agreement FDB expressing provided that it "utilized

12   reasonable care in collecting and reporting the information contained in the [NDDF] and has

13   obtained such information from sources believed to be reliable."

14   **T.    The Scheme Created Goodwill for McKesson with Its Retail Pharmacies**

15   124.    The difference between the WAC and the AWP prices "create[s] the gross margin for

16   pharmacy retailers under third party reimbursement plans."[42] As the difference between AWP and

17   WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical

18   benefit managers ("PBMs") opportunities for larger profits.[43]

19   125.    By engaging in the Scheme with First Data to raise AWPs by increasing the AWP-

20   WAC mark-up on all brand-name drugs to a uniform 25%, McKesson created goodwill with its

21   customers-retailers. By doing so, defendants defrauded end payors like Plaintiff, who purchased the

22   drugs involved in this lawsuit at prices inflated by the Scheme.[44]

23

24

25

26   ------

     [42] MCKAWP 0073551.

27   [43] MCKAWP 0069612.

28   [44] Updated Declaration of Dr. Hartman in Support of Class Certification (December 20, 2006) at 5.

- 32 -

COMPLAINT
001821-28 451449 V1

1

**U.     By 2001, First Data WAC-to-AWP Mark-ups Were Susceptible to Abuse**

2

126.     Traditionally, AWPs were set by manufacturers and provided to publishers.[45]

3       Publicly, McKesson itself recognized that WAC-AWP mark-ups originated from manufacturers, not

4       wholesalers.[46]

5

127.     Beginning in the late 1990s, due to government scrutiny and well-publicized AWP-

6       related litigation, many manufacturers stopped providing AWPs.[47] Some manufacturers even

7       ceased providing First Data with <u>any</u> price information (AWP or WAC), making First Data

8       increasingly dependent on wholesalers for price information.[48]

9

128.     Wholesaler Amerisource Bergen Corporation ("ABC") recognized that First Data's

10      AWP became a standard in the late 1990s *because* manufacturers were no longer publishing AWP.

11

129.     First Data knew that the market widely relied upon First Data AWPs and that it

12      played a crucial role as the most trusted supplier of such information. First Data knew that its

13      preeminent position in the market would be at risk if First Data admitted that it did not have a

14      reliable basis for calculating AWPs.

15

130.     Beginning in the 1990's, First Data adopted a survey method to calculate AWPs.[49]

16      First Data represented that its survey methodology asked *each* of the national wholesalers what

17      mark-up they applied to a given manufacturer or product line.[50]

18

19

[45] MCKAWP 0084296; MCKAWP 0083898; MCKAWP 0067439; AZ0449836-449850.

20

[46] One McKesson employee explained to an employee of WellPoint's PBM in November 2004 that

21      "McKesson does not maintain or alter product AWP's – we get that specific information from the manufacturer and from First DataBank. McKesson, of course, establishes that cost based upon industry practices and our cost from the manufacturer." WP-AWP009699-9703, at 9699.

22

[47] 6.28.07 Deposition of Patricia Kay Morgan at 228:25-229:12; *see also* RB 00157-RB 00171, at 00158

23      ("[W]e were concerned when the average wholesale price (AWP) designation – one of several pieces of data that *Red Book* collects from manufacturers – came under fire at federal and state levels this past year…. We continue to regard AWP as one guideline in the Rx pricing mix and to encourage the provision and

24      dissemination of fair, accurate prices by all suppliers.").

25

[48] Morgan Dep. at 179:12-22; MCKAWP 0069640 (Morgan e-mail acknowledging that FDB is missing manufacturers' WACs, noting that FDB is authorized to obtain them from wholesalers and requesting them

26      from McKesson).

[49] *See, e.g.,* FDB-AWP 15104.

27

[50] *See, e.g.,* FDB-AWP 02005 (FDB website, Frequently Asked Questions, dated November 4, 2002);

28      FDB-AWP 15104 ("Average Wholesale Price," Price Alert editorial, dated 2000).

- 33 -

COMPLAINT
001821-28 451449 V1

131.    As detailed below, at least by August 2001, when Amerisource merged with Bergen and when defendants began their collusion with FDB, its representation was no longer true. If it had been conducting regular surveys of each of the major wholesalers before, it certainly was *no longer doing so* by August 2001 because two of the "big three" wholesalers, ABC and Cardinal, refused to provide mark-up information to First Data. This propelled First Data to conspire with the remaining "big three" wholesaler, McKesson, so that it could continue publishing AWPs.

## V.    McKesson's Public Position was that AWPs were Determined by Manufacturers' Historic Mark-Ups and not by McKesson

132.    In January 2002, McKesson organized an upper-management "meeting to discuss McKesson's position regarding Average Wholesale Price."[51] Defendant Yonko, Senior Vice President of Purchasing and Pharma Finance, who was invited to this meeting, asked if he could "add Robert James to the invite list as he has had numerous discussions with First DataBank recently."[52] Mr. Yonko testified that he wanted defendant James, McKesson's Vice President of Brand Rx Finance Investment Purchasing, to take part in the meeting because:

> Bob was managing the process that I have described many times around – with First DataBank, relative to the markups that we carry in our system, the survey process, the updates to WAC. Again, many business aspects that have to do with First DataBank, Bob would seem to be more knowledgeable about than anybody else that I knew about.[53]

133.    Both Bob James and Greg Yonko attended the meeting,[54] which took place on or about January 16, 2002.[55] Among the topics discussed were "how different reimbursement models or change in reimbursement models might look,"[56] and "the legislative momentum surrounding the issue of Average Sale Price vs. Average Wholesale Price vs. Wholesale Acquisition Costs (WAC)

---

[51] MCKAWP 0065896.

[52] MCKAWP 0065896.

[53] 5.15.07 Yonko Dep. at 85:13-20.

[54] *Id*. at 85:22-86:2; MCKAWP 0084295.

[55] 5.15.07 Yonko Dep. at 87:8-11.

[56] *Id*. at 89:10-12.

- 34 -

1    and the complexities and potential implications to our customers of any such changes, and

2    eventually to our company [McKesson]."[57]

3        134.    At the meeting, it was agreed that Greg Yonko and Jeff Herzfeld, Senior Vice

4    President of Pharmaceutical Product/Pharma Finance, would "develop a position statement" that

5    could be used to "communicate throughout our management team so that we are on all on the same

6    page, so-to-speak, when discussing such issues with our customers, suppliers, and any legislative

7    types."[58]

8        135.    Yonko circulated a draft of the official McKesson position, which defined AWP as a

9    suggested retail price set by manufacturers' historic mark-ups and not established by McKesson:

10       **What is AWP?** - AWP or Average Wholesale Price represents a
     suggested retail-selling price for a branded or generic pharmaceutical

11   and has been around for many years. Its [sic] calculated as a markup
     from WAC (Wholesale Acquisition Cost). The markup typically runs

12   20 to 25% and is for the most part determined by historical spreads
     from the manufacturer (***not by McKesson***). McKesson carries the

13   price in our system and adjusts it if there is any pricing action. First
     DataBank publishes this price and it is the basis for all retail pharmacy

14   dispensed prescriptions that are covered by 3rd Party reimbursement
     plans for branded products.[59]

15
         136.    According to this official position, McKesson did not meddle with the manufacturer-

16   set AWP carried in its system and only adjusted the price if there was a pricing action, that is, if the

17   manufacturer changed its WAC.[60] And McKesson represented that it understood First Data to

18   publish the AWP consistent with the manufacturers' historic mark-up.[61]

19       137.    Notably, this policy, which was intended for public consumption, did not refer to

20   McKesson's participation in wholesaler surveys of AWP or state that AWP was in any way affected

21

22

23

24

----

25   [57] MCKAWP 0084295.

26   [58] MCKAWP 0084295.

     [59] MCKAWP 0084296 (emphasis added).

27   [60] *Id.*

28   [61] *Id.*

- 35 -

1    by a wholesaler pricing policy.[62] To the contrary, McKesson expressly disavowed *any involvement*

2    in determining mark-ups.[63]

3    **W.    Contrary to its Official Position, McKesson Raised its Internal Mark-Ups in an Effort to Increase AWPs**

4        138.    Although publicly disavowing its involvement in setting AWP/WAC mark-ups,

5    defendants had already begun as early as 2000 to manipulate AWPs by unilaterally imposing a 25%

6    mark-up on its suggested sell price for brand-name prescription drugs.[64] At his deposition in the

7    *Carpenters* class action litigation against McKesson and First Databank, Greg Yonko confirmed

8    that in the past McKesson had used the manufacturers' historic mark-ups to calculate projected

9    retail prices, *i.e.* its suggested sell prices:

10                Q.    How did McKesson calculate its suggested sell price?

11                A.    It's not a calculation. It was a number that we input into our
12                      system, and *it was again historical, provided by the
                      manufacturer, though it's currently not.*[65]

13    He also conceded that McKesson had increased the mark-up for its suggested sell prices with the

14    intent that FDB would use the higher mark-up to set AWP:

15                We are in business to support our customers, and we have always
16                supported our customers. And I believe that is what Bob is talking
                  about when he says we have attempted to raise AWP's to support our
17                customers, by changing our markup in our system, going through the
                  First DataBank survey process, and hoping that, in fact, the AWP's
18                will change.[66]

19        139.    McKesson knew that First Data had a virtual lock on the determination of AWPs

20    because First Data had in James' words "a contract with the Medi-Span group [the only other

21

22

23    ───────────────
      [62] *Id.*

24    [63] "The markup ... is for the most part determined by historical spreads from the manufacturer (not by
      McKesson). *Id.*

25    [64] MCKAWP 0057171; MCKAWP 0047807 ("Our mark up is not coming from our suppliers. Suppliers
26    [have] nothing to do [with] how we mark up our items. It is the Product Management team who make[s] the
      decisions on our mark up.")).

27    [65] 5.15.07 Yonko Dep. at 42:15-20 (emphasis added).

28    [66] *Id.* at 41:8-14.

                                    - 36 -
      COMPLAINT
      001821-28 451449 V1

electronic pricing source] requiring that FDB supply the data for the next 3 or 4 years [*i.e.*, through 2005 or 2006]. This means that essentially the Medi-Span data is the First DataBank data."[67]

140. Defendants knew that First Data purported to use a survey of national wholesalers to calculate AWPs and that, as the largest national wholesaler, McKesson had, as James stated in an e-mail to Yonko and other McKesson employees, "an opportunity to 'normalize' the AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)."[68] And if it were to succeed, "most [of its] customers would love it."[69]

141. Thus, defendants changed McKesson's mark-ups "in hopes that if one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items."[70] But when the competition did not respond as expected or First Data failed to "survey" the change as quickly as hoped,[71] defendants decided to work directly with First Data to increase AWPs.

---

[67] MCKAWP 0057415; *see also* MCKAWP 0057171 ("[Medi-Span gets] … its data from FDB. However, Redbook is a different deal. Redbook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a markup of 1.20 which provides a 16 ⅔% AWP spread. If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.").

Prior to 2001, First Data and Medi-Span were jointly owned by the Hearst Corporation. Following an investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medi-Span assets. Hartman Decl. (Dec. 2006) ¶ 17. As part of the divestiture, First Data was required to continue to provide pricing information to Medi-Span's purchaser for several years. *Id.*, *see also* MCKAWP 0057415; MCKAWP 0057171.

[68] MCKAWP 0068514.

[69] *Id.* (MCKAWP 0068514).

[70] MCKAWP 0068514.

[71] *See, e.g.*, MCKAWP 0068514 ("McKesson chose to increase the markup on the Parke-Davis line (Lipitor) [in January 2001] when Pfizer took them over. This was our [McKesson's] attempt to raise the AWP's to support our customers. The other two wholesalers did not do this. (I [Bob James, Director, Brand Pharmaceutical Production Management, McKesson] am told by FDB that the Parke-Davis products from Pfizer will most likely have the AWP's increased to 20% this January [2002] when price increases typically take place…. this will then be the same as the McK figure." (ellipsis in original)). *See also* MCKAWP 0065883-84 (September 18, 2001 e-mail noting that "Amerisource has pointed out to some of our customers in the Michigan market that we 'manipulate' AWPs on selected items," and that McKesson's internal mark-ups for Lipitor and Advair were higher than FDB's or Cardinal's).

- 37 -

142. In many of its internal communications McKesson candidly admitted that the change was made to increase its customers' profit margins.[72] For example, McKesson's John Bonner, Director of Brand Rx Product Management and Finance, observed: "There's been a great deal of activity of late, by McKesson, to increase AWPs on brand items to a uniform 25%. *That helps the pharmacy profitability greatly.*"[73] Reflecting on his achievements as of April 2003, Bob James noted:

> We played a major role (and still do) in normalizing the AWP's on Brand Pharmaceuticals from 16 ⅔% to 20% spreads [*i.e.*, 20 to 25% markups]. This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now). To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs. Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a 20% spread. Today, almost 95% of brand drugs carry a 20% spread. This has provided millions of dollars in improved profits across our industry.[74]

Another McKesson employee explained:

> I received a response to an e-mail last week from John Bonner. He mentions that McK is working to increase the spread on AWP to a uniform 25% on branded Rx. One of the benefits of this will increase reimbursements to our customers from third parties.[75]

Yet another McKesson employee reported: "What Bob explained to me a few months ago is we (mckesson) [sic] are working to 'expand' the margin between AWP and cost."[76] An internal memo discussing the mark-up changes states:

> Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

|  | Old 16⅔% spread | New 20% spread |
|---|---|---|
| Lipitor 20 mg 90's | $6.86 | $17.18 |

---

[72] *See, e.g.*, MCKAWP 0042664; MCKAWP 0065592; MCKAWP 0065885; MCKAWP 0066191-92; MCKAWP 0066464; MCKAWP 0068131; MCKAWP 0069594; MCKAWP 0069607; MCKAWP 0069615; MCKAWP 0071670; MCKAWP 0084327; MCKAWP 0084485.

[73] MCKAWP 0050602 (emphasis added).

[74] MCKAWP 0065592.

[75] MCKAWP 0066465-66.

[76] MCKAWP 0069732.

- 38 -

| | | |
|---|---|---|
| Prilosec 20 mg 30's | $4.22 | $8.92 |
| Allegra 60 mg 100's | $3.97 | $8.16 |
| Advair Discus 500/50 60 dose | $5.11 | $11.70 |
| Betasteron (previously a flat $7.00 fee) | | |
| | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant.[77]

143.    In other communications, James represented that McKesson increased its mark-ups for "business efficiency purposes" because McKesson's Retail List Prices and First Data's AWP often did not match:[78]

> [W]e were challenged to improve efficiencies in our systems, processes and execution of our Brand Rx Programs. One of the inefficiencies that we looked at was the number of manual overrides that were required to keep an accurate First DataBank (FDB) Average Wholesale Price (AWP) field in our system. Each time a pricing activity took place, a manual override was necessary when the Suggested Sell or Retail List Price was different from the FDB AWP. This took place several thousand times a year and increased risk of errors.[79]

James estimated that at the time 80% of brand mark-ups were set at 20%.[80] Yet rather than synching its mark-ups with those actually used by FDB, McKesson reached the following decision: "A decision was made to attempt to standardize our Brand Rx markups at 25% by using a 1.25 factor times the Wholesale Acquisition Cost (WAC)."[81]

144.    Logically, the only way that raising mark-ups to 25% in an industry dominated by 20% mark-ups would eliminate McKesson's "manual overrides" arising from price discrepancies with FDB is if FDB colluded with McKesson to increase AWPs across the board. In an e-mail, dated September 18, 2001, James explains:

---

[77] MCKAWP 0069609.

[78] *See, e.g.,* MCKAWP 0042663; MCKAWP 0065885; MCKAWP 0069608; MCKAWP 0069613.

[79] MCKAWP 0069608.

[80] MCKAWP 0069502.

[81] MCKAWP 0069608.

COMPLAINT
001821-28 451449 V1

<div style="margin-left: 2em;">

1      We are talking with First DataBank about "normalizing" the Brand
AWP spreads at 20% because we believe it makes sense for our
2      customers and also for our own efficiency in BIS. Today, when our
AWP differs from First Data Bank [sic], BIS has to manually input
3      the FDB AWP's. This translates to a great deal of extra work on
every price increase where this situation exists. *If all Brand product*
4      *was at 25% markup none of this manual input would be necessary.*[82]

</div>

5      145.  Defendants discovered that it was not difficult to impose its suggested sell prices on

6  First Data's published AWPs. In an October 9, 2001 e-mail, while still paying lip service to an

7  alleged survey process, McKesson marveled at "First Data Bank's willingness to work with us to

8  normalize the brand product AWPs."[83]

## X.  McKesson Colluded With First Data to Increase Brand Drug Mark-Ups

10      146.  As documented in James' March 22, 2002 memo to Yonko, McKesson began

11  colluding with First Data to increase brand drug mark-ups as early as August 2001:

<div style="margin-left: 2em;">

After a discussion with FDB last August [2001], *we mutually agreed*
to standardize the Searle (16⅔% spread) product line because it had
been acquired earlier by Pharmacia (20% spread). There seemed to be
momentum in the industry to move to a normalized markup of 25% on
brand Rx products. In December [2001], after several discussions
with FDB about our business efficiency improvement strategy we
began to move many of the manufacturers with mixed AWP spreads
(16⅔ and 20% products in the same line) to a consistent 25% markup.
These were companies like *GlaxoSmithKline, AstraZeneca, Aventis,*
*Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest,*
*Novartis, Roche, Schering and several others.* These were mixed
product lines and we just set their Suggested Sell Prices at a consistent
25% markup.

First DataBank re-surveyed most of these companies during January
and February when price increases occurred. Many of the AWP's
have been increased by FDB. Because a large number of price
increases occurred, some AWP's were affected twice, once when the
price increase[] took effect and then a second time when FDB raised
the AWP after the survey process.... Not all products in these
companies have had AWP increases at this point in time. However, as
price increases occur FDB will re-survey those products and make
their determination.[84]

</div>

---

[82] MCKAWP 0065885 (emphasis added).

[83] MCKAWP 0068599.

[84] MCKAWP 69608-09 (emphasis added). Note that one of the named manufacturers, GlaxoSmithKline
("GSK"), wrote on March 1, 2002, to First Data asking it to explain the "unexpected change" which led First
Data to list GSK products with a 25% mark-up. FDB-AWP 053695.

- 40 -

1    147.    While the memo invokes the survey process, First Data's express agreement to raise

2    the mark-up on Searle products is inconsistent with the use of a survey to ensure the appropriate

3    mark-up. More fundamentally, McKesson's "business efficiency improvement strategy," *i.e.*, the

4    goal of achieving harmony between its uniform 25% mark-up and FDB's data, could only be

5    achieved if FDB agreed to disregard contrary input from other industry sources and to override

6    historical mark-ups.

7    148.    Indeed, it was McKesson's Manager Business Information Services, Erlinda

8    Thomas' understanding at the time that she wrote the following March 14, 2002, e-mail that

9    McKesson dictated the price changes to FDB:

10   > Product Management is working closely with FDB to adjust their
     > mark up. FDB [has] been changing their mark up to match with our
11   > mark up. Eventually our list price will [be] equal to FDB's AWP.[85]

12   149.    An e-mail from McKesson Data Management Analyst, Pia Castillo, dated January

13   23, 2002, also confirms:

14   > ***AstraZeneca, Aventis, Bristol Meyers, GlaxoSmithKline, JOM, etc.***
     > These vendors are now at a 25% markup instead of 20%. Bob James
15   > is in contact with FDB in regards to adjustment of their AWP
     > pricing.[86]

16
     Notably, the McKesson e-mails, which were contemporary with the markup increases, do not refer
17
     to a survey process, and there are no FDB documents purporting to show that the changes to these
18
     manufacturer mark-ups were made as a result of a wholesaler survey.
19
     150.    On the other hand, the March 22, 2002, memo's discussion of an agreement with
20
     First Data, in or about August 2001, is reflected in the September 18, 2001, e-mail between James
21
     Yonko, which again refers to McKesson's recent "agreement with First Data Bank on raising"
22
     Searle prices.[87] The e-mail further reveals that the agreement was not limited to a few major brands:
23

24   [85] MCKAWP 0042664; 3.13.07 Deposition of Erlinda Thomas at 109:6-110:7 (testifying that she
     believed that the statement was true at the time she wrote it). As McKesson's Manager of Business
25   Information Services Ms. Thomas was in charge of data integrity for McKesson's price and drug information
     database. *Id.* at 8:1-17.
26
     [86] MCKAWP 0081250 (emphasis added).

27   [87] MCKAWP 0065885. Nor can there be any doubt that First Data was aware that the mark-up
     information that McKesson provided was made up from whole cloth. In addition to the preceding documents
28   referring to discussions with First Data about its normalization plan, the record also reveals that McKesson

- 41 -

COMPLAINT
001821-28 451449 V1

1  "*We are talking with First Data Bank about 'normalizing' the Brand AWP spreads at 20%* [*i.e.*,

2  markups at 25%] because we believe it makes sense for our customers."[88] The reference to "brand

3  AWP" refers to the AWPs for brand name prescription drugs. The October 9, 2001, e-mail between

4  James and Yonko, applauding "First Data Bank's willingness to *work with us* to normalize the

5  brand product AWP's,"[89] further supports the conclusion that McKesson and FDB agreed to

6  increase the markup on all brand name prescription drugs that did not already have the 25% markup.

7  151.  Other evidence also supports this inference. Consistent with an arrangement to

8  change the mark-ups on brand drugs to a uniform 25%, FDB changed the mark-up for TAP and

9  AstraZeneca to 25% on December 15, 2001.[90] The internal FDB e-mail directing the change does

10  not mention a survey, and FDB did not produce any documentation tending to show that a survey

11  was conducted to warrant the changes.[91]

12  152.  In January 2002, McKesson's John Bonner, Director of Brand Rx Product

13  Management and Finance, noted: "There's been a great deal of activity of late, by McKesson, to

14  increase AWPs on brand items to a uniform 25%. *That helps the pharmacy profitability greatly.*"[92]

15  He advised a sales manager to let customers "know we are fighting on their behalf to normalize

16  AWP @ 25% markup."[93] Again, there is no disclaimer that the AWPs are in fact determined by

17  objective surveys as opposed to McKesson's acknowledged price manipulation.

18  153.  Another internal e-mail from James to Yonko and others at McKesson demonstrates

19  the same understanding:

20

21  sent First Data a copy of its internal memo, titled "AWP Discussion," in which it stated: "McKesson has
chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of a

22  1.25 factor. This serves to level the playing field"; "customers may potentially benefit because this process
provides the opportunity for increased profitability if managed care contracts remain as they are today."

23  MCKAWP 0069602; MCKAWP 0069611.

   [88] MCKAWP 0065885 (emphasis added).

24  [89] MCKAWP 0068599 (emphasis added).

25  [90] FDB-AWP 033430.

26  [91] *See* Morgan Dep. at 278:16-279:9 (testifying that she could not recall any other written surveys other
than those produced by FDB and identified as exhibits at her deposition).

27  [92] MCKAWP 0050602 (emphasis added).

28  [93] *Id.*

- 42 -

1    Some of our friends in retail that I have spoken with are pretty
     overwhelmed *that we would be 'driving' this process on their behalf.*
2    Of course, we are not solely responsible for this 'normalizing' of
     AWP's but we have done our part as I have discussed with you
3    previously. I have had conversations with Albertsons and Safeway
     and a few others.[94]

4
     154.    McKesson documents also report that Bob James called Kay Morgan in early 2002
5
     "on behalf of VitaRx on Avonex and Copaxone" and reported that the call "resulted in a \$500K
6
     profit improvement for VitaRx," and "FYI. Kay Morgan, FDB confirmed today that this had been
7
     done."[95]  After the call, James circulated an e-mail:
8
                 Just a note to let everyone know that "I am told" that the markup on
9                Avonex and both the old and new sku's of Copaxone will be changed
                 to 25% (to create a 25% spread on WAC/AWP) next week.... Yes!!"
10
                 .... This should make a significant contribution to your profitability
11               as illustrated by the following example using a reimbursement of
                 AWP – 15% plus \$2.00 fee.
12
                 Avonex at 16⅔% spread, profit would be \$18.42 ... and now at a 20%
13               spread, profit would be \$51.31 ... not bad!

14               This is an increase of \$32.89 per script.

15               Copaxone at 16⅔% spread, profit would be \$19.72 ... and now at
                 20% spread, profit would be \$57.39 ... pretty good!
16
                 This is an increase of \$37.67 per script.[96]
17
     155.    Other communications do refer to a survey process, but they generally betray
18
     McKesson's expectation that the alleged survey process will merely confirm McKesson's 25%
19
     mark-up. For example, an e-mail dated February 15, 2002, from Bob James states:
20
                 What we are seeing is a 'normalizing process for the brand Rx items.
21               As you know, suppliers do not set AWP, wholesalers do not set AWP,
                 and neither does FDB. Wholesalers set their individual markups or
22               Suggested Sell or List Price as in the case of McKesson. I am not sure
                 what the other wholesalers call their sell price. This is done
23               independently. FDB takes a survey of at least three national
                 wholesalers and if 2 out of 3 are at a 25% markup, then that becomes
24

25   [94] MCKAWP 0065895 (emphasis added).

     [95] MCKAWP 0069615; *see also* MCKAWP 0084327.
26
     [96] MCKAWP 0084327; *see also* MCKAWP 0065592 (April 22, 2003, memo from Bob James to Greg
27   Yonko: "Worked on behalf of Vita Rx (now MSD) in raising the AWP's on Avonex, Copaxone and
     Betaseron to 20% [spread]. The impact of this effort was to increase their profits by about \$800k per year ...
28   each year, not just one time.").

                                               - 43 -

1    the AWP ... I think it is very positive for the industry and most
     people will be delighted when they understand what is going on and
2    how the process works.[97]

He then predicts: "*In a few months I would expect to see most brand products at a 25%*

*markup.*"[98] Given that McKesson is advocating a 25% mark-up in a predominantly 20% market

where such mark-ups have remained largely unchanged for years, James' expectation of widespread

change – let alone such change over a matter of months – is simply not comprehensible unless he

also believed that FDB was complicit in McKesson's Scheme.

156.    This inference is further supported by the statement he makes on February 26, 2002,

that he is simply waiting for FDB to "catch up" to McKesson's mark-ups and that he has been told

by FDB that these changes, and the higher AWPs they entail, are imminent:

     The McKesson Sugg Sell or List Prices for Brand Rx will remain at
     the 25% markup, however. *We expect the FDB AWP's to catch up
     over the next month or so as things normalize in the industry.* I was
     not aware until last week that our BIS group was changing the AWP
     field to match or Sugg Sell or List Price field in the DITM before First
     Data Bank actually made the changes. *We have been told by FDB
     that the items were going to move up but there obviously have been
     some timing issues.* It's my fault, I guess I did not communicate very
     clearly. There will be no changes to the FDB AWP field unless the
     information comes by electronic download from FDB.

     When the changes do occur, there will be a slight time delay for our
     system to be changed. More importantly, there will most likely be a
     longer timedelay for the third parties to pick up and input *the new
     higher AWP's.*[99]

157.    A month later, James' confirms for Yonko his expectation that FDB has changed the

mark-ups on the majority of brand manufacturers:

     I am told by FDB that 90% of the Brand Rx companies are now listed
     as 1.25 factor or 25% markup companies. Not all products in these
     companies have had AWP increases at this point in time. However, as
     price increases occur FDB will re-survey those products and make
     their determination.[100]

---

[97] MCKAWP 0069590; MCKAWP 0069591.

[98] MCKAWP 0069592 (emphasis added).

[99] MCKAWP 0057428.

[100] MCKAWP 0069609.

- 44 -

In light of McKesson's confidence that FDB's AWPs will "catch up" to McKesson's Suggested Sell or List Prices in short order, this statement indicates that by "survey" James does not mean an objective determination of the prevailing mark-up among the national wholesalers, but merely the application of the agreed-upon 25% mark-up to the NDCs whose WAC price was increased by the manufacturers.

158.    Similarly, in response to Erlinda Thomas' representation that FDB adjusted its mark-ups to match McKesson's, McKesson's field staff personnel, Joy Puccetti, responded:

> Erlinda: thanks for the update. Can you or our product managers give us some idea when all of our LIST prices will be adjusted to match FDB's AWP?

James interjected:

> Joy, its really happening the other way around. McKesson is normalizing our Sugg Sell or Retail List, and AWP increases usually happen when FDB re-surveys the wholesalers after price increases. They set the AWP where 2 out of 3 of the national wholesalers are using the same markup. We just happen to be improving our process to eliminate the need to override AWPs with each pricing activity in the future. I spoke with FDB earlier this week and they stated that about 90% of the vendors have been changed to 25% markup and use a 1.25 factor (times the WAC). *Some of the detail needs to catch up with individual sku's as price increases occur. The remaining vendors should be done over the next quarter. My guess is that things should look very good in the next couple of months. I am working with FDB to point out problem suppliers as Erlinda's group provides me the weekly information comparing our List Price with the FDB AWP.* Sorry for the extra confusion and questions that have come up from our customers. The (unintended consequences) results should have a very positive impact on our customers['] profitability.[101]

McKesson sends another such coded message in an e-mail, dated April 25, 2002, re "AWP Situation Status." James advised Greg Yonko of the progress of the Scheme:

> The following is a summary of activity on the subject of AWP:
>
> 1. There is a movement in the industry to normalize the brand Rx markup at 25% to create a 20% AWP spread.
>
> 2. 90% of vendors have been moved to a 1.25 markup factor at FDB.
>
> 3. Actual AWP changes have been occurring around price increases and FDB re-surveying the market.

---

[101] MCKAWP 0042663.

- 45 -

1        4. We are working with FDB to improve "their accuracy" on WAC
    pricing because ours is extremely accurate.

2

3        5. … We will be sharing information with FDB on WAC price
    changes in order to make us both more accurate.

4        6. McKesson has had no new proactive changes since last February
    except as noted above with Avonex and Copaxone.

5                * * * *

6        9. All new brand vendors will be set up as 1.25 markup factor
7        vendors, ***both at McK and FDB***."[102]

8    While the McKesson e-mail refers to a survey process, it also refers to FDB's agreement to raise the

9    mark-ups for Avonex and Copaxone – without the benefit of a survey, and there is no pretense of a

10   survey for new manufacturers. Their mark-up is set by fiat: "All new brand vendors will be set up

11   as 1.25 mark-up factor vendors, both at McK and FDB."[103] Additionally, at least for "about 90% of

12   the vendors," the alleged survey process is perceived as simply a means of applying the pre-

13   determined mark-up "as price increases occur."[104]

14       159.    John Bonner also represented that McKesson's normalization plan was the driving

15   force behind the changes and not a survey process:

16       We are trying to <u>Normalize</u> brand pricing at 25%. As time goes by all
    pricing services will pick up on these changes as they average in.

17

18       Medi-Span is owned by First Data Bank and should see the changes
    eventually.

19       Please don't use language that we are trying to increase AWP's with
    customers. We don't want to be viewed as increasing prices but in

20       favor of normalizing branded items at a flat 25% markup that will
    level the playing field from vendor to vendor.

21       I really don't see what problem your customer is experiencing in the

22       negative. Higher AWPs should make the pharmacy more profitable.
    . . . .

23

24       ***Bob James is working with FDB to make this happen over time*** and
    I'm not sure it is something we want discussed.

25

26   [102] MCKAWP 0069615 (emphasis added).

27   [103] *See also* FDB/NEC 040006 (e-mail from McKesson to FDB: "Any new brand pharmaceuticals will
be added at 1.25 going forward.").

28   [104] MCKAWP 0042663.

- 46 -

COMPLAINT
001821-28 451449 V1

1    Please contact him before discussing outside the company.[105]

2    We try to 'push' the AWP up to 25% above WAC rather than 20%.
     This may cause your customer some short term reimbursement pain
3    with the payors, but in the long run, if AWP at First Data Bank goes
     from 20% to 25%, *your customer will benefit*.[106]

4
     160.    McKesson's monthly status reports for Rx Brand Product Management also reported
5
     its many successes raising AWPs.[107] And McKesson's efforts to raise AWPs were prominently
6
     featured in an internal memo from Bob James identifying accomplishments and developments for
7
     2003.[108]
8
     161.    In addition to the foregoing examples from McKesson's internal documents
9
     supporting the existence of an agreement or concert of action, the parties' conduct also demonstrates
10
     that the AWP survey process had given way to the mark-up scheme.
11
     162.    Many of the communications between First Data and McKesson about manufacturer
12
     mark-ups were initiated by McKesson, not First Data, and they do not discuss a survey. For
13
     example, on November 9, 2001, Bob James wrote to Kay Morgan:
14
     Hello Kay . . . . . . . . Just went through the Merck items and updated
15    a couple of our items to 25% markup. However, found some items
     that you might want to review. They include Noroxin's, Prinivil and
16    Prinzide's. The latter two, should probably be consistent with the new
     AZ 1.25 markups.[109]
17
     163.    On other occasions, Bob James also gently reminded First Data to raise AWPs on
18
     certain brands:
19
     Hello Kay, this note is from BMS [Bristol-Myers Squibb] and is
20    basically saying that FDB shows BMS at a 20.5% mark up while
     McKesson is showing a 25% mark up. I am assuming that they are
21    looking at current information and I thought we took care of this
     several weeks ago. Ain't it Great.[110]
22

23

24    [105] MCKAWP 0066464 (emphasis added).

25    [106] MCKAWP 0076289 (emphasis added).

     [107] MCKAWP 0066191-92 (October 2002) and MCKAWP 0071670 (December 2002).
26
     [108] MCKAWP 0065592.
27
     [109] MCKAWP 0068621.
28   [110] MCKAWP 0069586.

- 47 -

COMPLAINT
001821-28 451449 V1

1    Rite Aid called this morning complaining about the Diamox AWP.
     Just wondered if you had a chance to get to it yet?[111]

2

3    We're catching some flack from some of our large retail friends about
     the Wyeth products that were sold to Barr ... Of course, we raised the
     prices on both NDC's for consistency, ... See if it makes sense to you
4    that both NDC's should carry the new price.[112]

5    Good morning ....

6    We've had a couple of inquiries from the field asking us to correct our
     AWP's. J&J and one of the other wholesalers are saying that the
7    McKesson AWP's are incorrect. We have them marked up 25% like
     the rest of the J&J line. When you have a minute, would you verify
8    that our file matches the FDB file.[113]

9    164.    Many of the communications from First Data are also more consistent with an

10   agreement to change AWP than an objective survey to determine what it should be. For example,

11   on April 1, 2002, Alisha Nielson, Kay Morgan's assistant at First DataBank, e-mailed Bob James to

12   "please provide me with your mark-up for Endo."[114]   James responded that McKesson used a 25%

13   mark-up, and moments later, without any indication that she had received (or even requested)

14   responses from other wholesalers, Alisha Nielson forwarded his response to her co-worker, Inna

15   Dimitshteyn, with the instruction: "Please change the mark-up for Endo to 1.25 WAC."[115]

16   165.    Similarly, the following exchange between McKesson and FDB led to increased

17   mark-ups for Lexapro and Celexa:

18   [McKesson] Question: Is Forest's new Lexapro at 1.25? and we still
     have Celexa at 1.20. The retail customers would love to have that one
19   changed. Please advise. Thank you.[116]

20   [FDB] Lexapro & Celexa by Forest are still at the 1.20xW markup.
     *We will change this as directed*, unless Kay objects. I will speak with
21   her about this. She is in a meeting right now.[117]

22   _____

23   [111] MCK 0001168.

     [112] MCKAWP 0070781.

24   [113] MCKAWP 0001188. Kay Morgan responded: "We are in sync. Janssen still suggests [sell price] on
     some items and perhaps this is one but as you know Manufacturer suggested is not the same as AWP. Don't
25   know who is complaining (Janssen?) but FDB and McKesson match."

26   [114] FDB/NEC 031778.

     [115] *Id.*

27   [116] FDB/NEC 040006.

28   [117] FDB/NEC 040006 (emphasis added).

- 48 -

COMPLAINT
001821-28 451449 V1

166.    Soon after this exchange, Seattle-based retail pharmacy Bartells e-mails McKesson

with the subject line "Low AWP companies" to complain about a low mark-up for Galderma.[118]

James responds with the subject line, "See, we listen":

>   Celexa and Lexapro will have an AWP markup of 25% or a spread of
>   20% as soon as FDB information is updated. Look for a change to
>   happen next week.
>
>   Keep smiling[g] ..., and who said we never listen to our customers
>   (and old friends).[119]

167.    Bartells thanks James and immediately turns its attention to Clarinex:

>   THANKS....I GUESS I HAVE STIRRED THINGS UP WITH THE
>   FOREST PEOPLE ... ALL YOU HAVE TO TELL THEM IS THAT
>   WE AREN'T GOING TO STOCK LEXAPRO AND PUT IT ON
>   SPECIAL ORDER LIKE OXYCONTIN.
>
>   SCHERING REP CALLED AND WANTED TO KNOW WHAT I
>   WAS GOING TO DO TO MOVE THE CLARITIN BUSINESS TO
>   CLARINEX ... NOT A THING, I REPLIED ... THE AWP/TO
>   COST IS MUCH BETTER ON ZYRTEC, ALLEGRA AND
>   CLARITIN ... [ellipsis added] SHE IS GOING TO TALK TO HER
>   BOSS ABOUT GETTING THE CLARINEX AWP CHANGED.[120]

168.    McKesson responds to Bartells that the change to Clarinex has already been

arranged:

>   fyi.
>
>   Schering is set up at FDB as a 1.25 vendor (meaning 25%
>   markup/20% spread). Clarinex will be moved at the next price
>   increase when a new survey would be done.[121]

Again although James mentions a "survey," the outcome of the alleged survey is a foregone

conclusion.[122]

169.    Similarly, in McKesson's Monthly Status Report, Rx Brand Product Management,

General Overview October 2002, James reports:

---

[118] MCKAWP 0069819.

[119] MCKAWP 0069817.

[120] MCKAWP 0069818.

[121] MCKAWP 0069818.

[122] *See also* MCKAWP 0069857 (September 30, 2002, e-mail from McKesson to FDB (three weeks after the Bartell's exchange): "Even the Shering folks would like to see the AWP raised on Clarinex. Last time I spoke with Chuck, I gave him the standard response about process.").

- 49 -

COMPLAINT
001821-28 451449 V1

> We have had some recent success in getting some AWP issues resolved by requesting that new surveys be done on Celexra and Clarinex. Both items had AWP spreads increased to 20% from 16 2/3% last month. This is a huge boost in profitability for our retail customers. We are working on getting some adjustments done on Lilly and Novo Nordisk products (insulin).[123]

And indeed it happens. On December 3, 2002, Kay Morgan orders her assistant to change the mark-up on E.I. Lilly to 25%. There is no mention of a survey to instigate the change.[124] FDB did not produce any documents to indicate that one was ever taken.[125] The change to Novo followed close behind. On December 19, 2002, Morgan e-mails James: "FYI – Novo[is] going to 1.25 today. Can't have their products at 1.2 and Lilly at 1.25."[126]

170.    Other exchanges also demonstrate that McKesson and FDB worked closely to change the mark-ups for brand drugs industry-wide. For example, without any explanation, Kay Morgan forwards to Bob James an internal First Data e-mail advising that First Data was moving Reliant to a 25% mark-up.[127] Also when Alisha Nielson e-mails Bob James to request a mark-up for Enzon and copies Kay Morgan, Morgan responds before James even has a chance to answer:

> Alisha,
> Go ahead and put them on 1.25 times WAC.
> Thanks,
> Kay[128]

171.    And in response to James' inquiry about whether First Data had a 25% mark-up on some of J&J's product lines, Morgan responded: "We are in sync."[129]

172.    Likewise Kay Morgan responded to an e-mail from Bob James asking whether Prilosec over-the-counter could be considered like the prescription product with a 25% mark-up: "Thanks and we have you covered."[130]

---

[123] MCKAWP 0066192.

[124] FDB/NEC 015451. On the contrary, earlier that year Lilly had complained to FDB's CEO and COO that FDB was manipulating AWPs. MCKAWP 0068863.

[125] *See* Morgan (2007) at 278:16-279:9 (testifying that she could not recall any other written surveys other than those produced by FDB and identified as exhibits at her deposition).

[126] MCKAWP 0069553.

[127] MCKAWP 0069782.

[128] FDB/NEC 032733.

[129] MCKAWP 001188.

- 50 -

COMPLAINT
001821-28 451449 V1

173. Also consistent with advancing the Scheme, McKesson conducted weekly review of First Data's AWPs.[131] In April 2002, James forwarded one of McKesson's comparison files to Kay Morgan, asking her to

> let me know if you think this type of information is useful and also if you need additional information. *We should be enthused about how good this is looking.* Thank you for all your cooperation. We can get similar information on the rest of the file that would include generics and OTC/Home Healthcare but for now I would like to focus on the brand products[.][132]

Morgan replied: "It's a start. … I agree, brand comes first."[133]

174. In another instance, James wrote of McKesson's weekly FDB AWP comparison files:

> From the weekly data that I have been using, there are fewer than 100 brand items where we are not using the FDB AWP because its [sic] not correct. They have the WAC and the AWP the same or 0.00 WAC or an old AWP that is less than our current WAC *or they use a different multiplier* and round down. I have asked you to find out from Rite Aid if they would agree to us putting in a 25% markup (or 20% spread) on these items *until FDB catches up.*[134]

> I need to look at all brand Rx AWP's and not just the ones that are problems. This will give me a chance to look at the big picture and *see what I have left to do.*[135]

175. McKesson also discovered that some of First Data's AWPs were low because First Data had no data or inaccurate WAC information or none at all. In May 2002, Bob James observed, "Most of the problem here [*i.e.*, any remaining discrepancies between McKesson's suggested sell prices and FDB's AWPs] is that FDB does not have a WAC (just using 00.00[)]. We are providing them our figures and they will input them next week. This will get us very close to being on the

---

[130] MCKAWP 0070967.

[131] MCKAWP 0042663.

[132] MCKAWP 0069617 (emphasis added).

[133] MCKAWP 0069640. Over the course of the Class Period, McKesson forwarded several of its AWP comparison files to FDB. *See, e.g.,* MCKAWP 0069717; MCKAWP 0070784; MCKAWP 0070826; and MCKAWP 0070928.

[134] MCKAWP 0063858 (emphasis added).

[135] MCKAWP 0069820 (emphasis added) (e-mail string between James and others at McKesson re FDB AWP comparison report).

COMPLAINT
001821-28 451449 V1

money."[136] The previous month Bob James noted in an e-mail to Yonko and others, "We are working with FDB to improve 'their accuracy' on WAC pricing because ours seems to be extremely accurate."[137]

176.    To correct this problem and to ensure that the mark-up changes were implemented promptly when the WAC increases occurred, McKesson decided in April 2002, to

> monitor (weekly) the items where the FDB WAC and McK WAC are different and send information to FDB to discover why. These items should be corrected quickly once we discover the reason it is happening and correct the process if necessary.[138]

The next month Bob Roberts reported: "Kay Morgan has agreed to use our WAC prices where they show none presently. This is positive."[139]

## Y.    McKesson Sought to Conceal its Collaboration with First Data

177.    The implication that McKesson knew that it was not simply participating in an objective survey process with First Data but rather manipulating prices, is further underscored by McKesson's efforts to make the discovery of its Scheme more difficult.

178.    In a February 21, 2002, e-mail discussing McKesson's efforts to increase AWPs, McKesson's John Bonner closed with the admonition: "I'm not sure it is something we want discussed.  Please contact him before discussing outside the company."[140]

179.    When Brian Ferreira of VPS Retail wrote to Bob James asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing: "Brian, this is an interesting request…. Please give me a call when it is convenient."[141]

180.    McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

---

[136] MCKAWP 0068889.

[137] MCKAWP 0069615.

[138] *Id.* (MCKAWP 0069616).

[139] MCKAWP 0069669.

[140] MCKAWP 0066464.

[141] MCKAWP 0069714.

- 52 -

1      Confidentially. Not to pass on. We have [only] about 470 brand Rx
       items where McK and FDB AWP's do not match....[142]
2
3      [Bob James, discussing McKesson's efforts to raise AWPs:] For
       obvious reasons we don't want to write a memo and send it out
       because it would not be kept confidential.[143]
4
5      [James, responding to McKesson field associate's request to share
       information about McKesson's efforts with her customers:] I would
       be careful ..... You be the judge on how your customer will
6      interpret.[144]

7      [McKesson field associate writing to John Bonner:] My accounts are
       having many issues with us 'Normalizing brand pricing at 25%' ....
8      You also mentioned that we should not discuss [this] outside of
       McKesson, how would you suggest we answer our customers[']
9      questions?[145]

10     [McKesson field associate, discussing McKesson's "normalization
       plan":] Obviously this is not out to the field.[146]
11
       [James, signaling to McKesson employees that they should not state
12     in writing that McKesson changed its markups to improve its
       customers' profitability:] Remember, **"McKesson is doing this to**
13     **improve our inefficiencies in our BIS group."** With mixed AWP
       spreads, our BIS group is required to make manual overrides (for
14     every pricing activity) to input the First Data Bank AWP whenever
       there is a difference from our Suggested Sell or List Price. It could be
15     stated as a benefit of the Sixth Sigma method of identifying defects.
       An "unintended consequence" is that the profitability of our
16     customers will be impacted in a positive way. They will basically get
       3⅓% more profit on Rx's filled with this new AWP spread. (Just
17     imagine what this would mean on drugs like Lipitor or Prilosec.)
       [boldface in original][147]
18
       181.    And First Data also knew the importance of keeping the Scheme a secret. In
19
       response to an e-mail inquiry about whether electronic drug pricing publishers were increasing the
20
       WAC-AWP spread, Kay Morgan denied any involvement and brandished the false "survey"
21
       defense: "I am most curious as to the source of this rumor. First Data Bank has always used a
22

23

24     [142] MCKAWP 0068889.

25     [143] MCKAWP 0069591.

       [144] MCKAWP 0069592.
26
       [145] MCKAWP 0066464.
27     [146] MCKAWP 0069732.

28     [147] MCKAWP 0065895 (emphasis in original).

                                              - 53 -

wholesaler survey to determine AWP."[148] She forwarded the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer," to which he responds: "I love it! You are the best."[149]

182. Evidence also suggests that McKesson and First Data agreed, whether explicitly or implicitly, to perpetuate the myth of the objective survey process as a means of covering their Scheme. For example, after FDB had already agreed to raise the mark-up on Schering products,[150] James forwarded an e-mail from Schering asking for McKesson's help in raising FDB's mark-up on Clarinex so that it could remain competitive with Claritin[151] – another of the drugs that were increased as a result of the Scheme: "Even the Shering folks would like to see the AWP raised on Clarinex. Last time l spoke with Chuck, *I gave him the standard response about process*."[152]

183. And publicly, throughout the 2001-2005 period, FDB falsely represented that its surveys were "performed with all national wholesalers to determine the appropriate AWP."[153]

## Z. McKesson Benefited From the Scheme

184. McKesson benefited from the Scheme because it was able to demonstrate to its customers its willingness to create an environment of greater pharmacy profits. McKesson anticipated that the Scheme would ensure customer loyalty and possibly increase its customer base, and, in fact, McKesson did maintain and increase its customer base.

185. McKesson's customers included the largest retail chains in the country: A&P, Albertsons, Brooks, Costco, Eckerd, Giant Eagle, Hy-Vee, Kinney Drugs, Long's Drugs, Rite Aid, Safeway, Randall's Shopko, Snyder's, Spartan, Super D/USA Drug, Target, Wal-Mart, Walgreens, and Wegmans.[154]

---

[148] MCKAWP 0069588.

[149] *Id.*

[150] *See* MCKAWP 0069818.

[151] MCKAWP 0069857.

[152] MCKAWP 0069857.

[153] *See, e.g.*, FDB-AWP 02023; FDB-AWP 02005.

[154] MCKAWP 0074408.

- 54 -

COMPLAINT
001821-28 451449 V1

186.    Defendants also appreciated that to benefit from the scheme McKesson would have to inform its customers that it was behind all these changes, otherwise "it's possible that some of these accounts will believe that this stuff just happens and our efforts will go unrecognized."[155] "This sounds like something we should at least [be] quietly communicating to our customers in order to get some mileage from it[.]"[156] Greg Yonko affirmed: "I also think we should start communicating any AWP changes so customer[s] know what's going on, the end result should be beneficial."[157]

187.    And so it began:

> [To Bartell Drugs:] Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for change to happen next week. Keep smilin[g] . . . and who said we never listen to our customers (and old friends)."[158]

> [To Bartell Drugs:] Just wanted you to know that Clarinex AWP spreads went to 20% this week. A few weeks ago Celexa went to 20% as well. Fat cat status is just around the corner.")[159]

> [To Rite Aid:] P.S. latest AWP changes ... Celexa and Clarinex, working on Lilly and Novo.[160]

> [To various individuals, not identified by pharmacy:] "I am told" that the mark up on Avonex and both the old and new sku's of Copaxone will be changed to 25% (to create a 25% spread on WAC/AWP) next week.... Yes!! .... This should have a significant contribution to your profitability as illustrated by the following example using a reimbursement of AWP – 15% plus $2.00 fee:

> Avonex at 16⅔% spread, profit would be $18.42 ... and now at a 20% spread, profit would be $51.31 ...not bad! This is an increase of $32.89 per script.

> Copaxone at 16⅔% spread, profit would be $19.72 ... and now at 20% spread, profit would be $57.39 ... pretty good! This is an increase of $37.67 per script.[161]

---

[155] *Id.*

[156] MCKAWP 0069732.

[157] MCKAWP 0084300.

[158] MCKAWP 0069817.

[159] MCKAWP 0069901.

[160] MCKAWP 0069911.

[161] MCKAWP 0084327.

- 55 -

1    188.   A field agent reported that customers were beginning to understand McKesson's

2    efforts: "Some of the more sav vy [sic] stores like Med-X have taken notice."[162]

3    189.   In an e-mail to Yonko and others, James explained that the goodwill McKesson

4    established with the pharmacies as a result of inflating AWPs would give it a substantial edge over

5    its competition:

6    > In my discussions [with select customers about McKesson's efforts to
     > "normalize" the AWP markup at 25%], one of the comments that was
7    > made was "this would certainly be a good reason to renew our
     > agreement with McKesson when its time." Talk about being good
8    > partners, wow! This is worth further discussion as we go forward.
     > Maybe a proactive strategy like this will soften some of the activity
9    > around asking for lower costs and more benefit.[163]

10   190.   James proposed to Yonko and others that they discuss McKesson's efforts with

11   customer Omnicare who purportedly was looking for an extra-contractual year-end bonus in the

12   neighborhood of $500,000:

13   > Omnicare is looking for . . . . . . say $500,000 in benefit from year end
     > deals, even though this was not part of their contract. We need to ask
14   > them to roll up or recalculate their reimbursements for last year based
     > on the new AWP's with a 20% spread. And . . . . . . this is **not just a**
15   > **one time benefit**. They will receive this now and each year going
     > forward until they renegotiate contracts with third parties (and
16   > hopefully do not give up this gift).[164]

17   191.   James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid

18   to let him know how much effort we are putting into this AWP thing to get it right."[165]  Other

19   customers were also appreciative. For example, an unnamed customer from Ohio called McKesson

20   "to say that he was looking at some of these items again and found that the spread appears to have

21   increased significantly on most of these items to the area of 20-21%. He wondered if we had any

22   part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[166]

23

24

---

25   [162] MCKAWP 0069732.

26   [163] MCKAWP 0065895.

     [164] MCKAWP 0065895 (emphasis, ellipses in original).

27   [165] MCKAWP 0069669.

28   [166] MCKAWP 0069513.

COMPLAINT
001821-28 451449 V1

1    192.    Med-X Corp.'s Director of Operations, Jerry Howard, reviewed the numbers, put two

2    and two together[167] and "was very ex[c]ited about" McKesson "working on AWP expansion."[168]

3    193.    These internal comments are consistent with the 2007 public statements of

4    McKesson CEO and President John Hammergren, which emphasize that, while McKesson wishes to

5    help its retail customers, it only seeks to do so when that help is mutually beneficial:

6                    As to all of their [pharmacies'] pressures effect on McKesson, all of
                     those [Medicare Part D] things are outside of our scheme. We don't
7                    use AWP or AMP or PDP negotiated prices. Our contractual
                     relationships with our customers are independent of those
8                    mechanisms. So to the extent that they are hurt, clearly, they can
                     come back to us and say we would like to have you help us with our
9                    margin pressure. And although we're sympathetic to those plights,
                     they've been asking us to help them with their margin pressures for 30
10                   or 40 years. We would have already ceased to exist if we had helped
                     them with their margin pressures over the years. So I think that's
11                   more of a market competitive issue for McKesson as to how we would
                     respond, as opposed to whether or not they're going to ask us for a
12                   better deal. We're asked about a better deal all the time by our
                     customers, and our sales forces and our management teams are trained
13                   to only provide better deals if it's a better deal for McKesson and
                     there's some way to for us to get a win-win out of it, as opposed to
14                   gee, I feel your pain; why don't you take part of my margin?[169]

15   194.    Of course, increasing AWPs in collusion with First Data was a "win-win"

16   proposition for defendants, because it rewarded McKesson's retail customers *without* costing

17   McKesson. Instead, reimbursers and patients all around the country would pay the increased costs

18   of the Scheme.

19   195.    In an internal document dated February 3, 2004, McKesson bragged that it

20   maintained its status as the market share leader by retaining "100% of [its] key RNA [retail national

21   accounts] base," winning "2-3 new big customers," capturing "30% of Regional chains" and

22   expanding its "#1 position" among wholesalers.[170]

23

24

---

25   [167] MCKAWP 0069732.

26   [168] MCKAWP 0069726.

27   [169] McKesson Corporation at the Goldman Sachs 28th Annual Global Healthcare Conference, *Fair Disclosure Wire* (June 13, 2007).

28   [170] MCKAWP 0074404 at 74410.

- 57 -

COMPLAINT
001821-28 451449 V1

196.    Although McKesson never mentioned the Scheme or the benefits McKesson derived

from it in public filings and other representations to the investing public, McKesson did

acknowledge that it benefited from price increases for brand drugs.

197.    In an earnings conference call in the first quarter of 2003, McKesson's CEO John

Hammergren stated that McKesson's "gross margin expansion is being driven a little bit now by

price increases on branded products and if those price increase trends stay the way they are, we

could very well see gross margin expansion, as well."[171]  Three months later, during a second

quarter 2003 earnings conference call, Hammergren stated:

> You know, we continue to see a nice drug price inflation, probably in
> the 4-and-a-half to 5-and-a-half percent kind of range, and certainly as
> strong as it was in the prior fiscal year.  We continue to find ways to
> leverage our customer base to get margin opportunities for the
> manufacturers, and we're very positive about the way it looks for the
> balance of the year.[172]

McKesson continued to report the positive effect of price increases for another year.[173]

**AA.    McKesson's Internal Documents Admit the Long-Term Effects of the Scheme**

198.    While the Scheme was still in its infancy in September 2001, McKesson realized that

it would have a profound effect on its customer's profitability:

> In August we were able to get the Concerta (formerly an Alza product
> and now JOM) AWP spread raised to 20% from the previous 16 ⅔%
> [i.e. an increase in the markup from 20% to 25%].  Last week we got
> agreement with First Data Bank on raising the Searle products, which
> are now part of Pharmacia, to a 20% spread as well as Genotropin
> which was a Pharmacia product (with a 16 ⅔% spread).  This may not
> seem like a big deal but it has a huge positive impact on the
> profitability of our customers.[174]

199.    Clearly, if McKesson had believed that the increases were only short-term, it would

not have bragged about a "huge positive impact on the profitability of our customers."  And in the

---

[171] *See* July 23, 2002, *Fair Disclosure Wire* article.

[172] *See* October 21, 2002, *Fair Disclosure Wire* article.

[173] *See* January 21, 2003, *Fair Disclosure Wire* article, Event Brief of Q3 2003 McKesson Corporation Earnings Conference Call (describing "this solid pricing environment" and stating "[t]he pricing levels were above 5%.  We feel strongly those products are protected and have good market share and price increases."); July 24, 2003, *Fair Disclosure Wire* article, Q1 2004 McKesson Corporation Earnings Conference call (stating that "drug price increases continue to be robust").

[174] MCKAWP 0065885 (September 18, 2001, e-mail from Bob James to Greg Yonko).

- 58 -

COMPLAINT
001821-28 451449 V1

1  previously cited e-mail from January 2002, Bob James confirmed this when he explained that

2  McKesson expected their customers to hold onto the "gift" of the increased mark-ups well into the

3  future:

4          A couple of years ago I was pulled into a conference call with Steve
   somebody (I think) and our McKesson MHS sales person, about how

5          we were hurting them with our AWPs. He came on very strong and
   was going to call John Hammergren, etc. We calmed him down by

6          explaining our process and tried to make him understand that we were
   really their advocates and were doing everything possible to "raise

7          AWP's when appropriate. I haven't heard anything since."

8          Here is an idea. Two years later, and having had some recent success
   in raising AWP's, I think this could be presented to him positively in

9          this way:

10          .... We need to ask them to roll up or recalculate their
    reimbursements for last year based on the new AWP's with a 20%

11          spread. And this is **not just a one time benefit**. They will receive
    this now and each year going forward until their renegotiate contracts

12          with third parties (and hopefully do not give up this gift).[175]

13  Similarly, James confirmed in April 2003, that "We played a major role (and still do) in normalizing

14  the AWP's on Brand Pharmaceuticals" also confirms that this has provided millions of dollars in

15  improved profits across our industry.[176]

16      200.    As many as *three years* after the Scheme was implemented, McKesson employees

17  were still internally congratulating each other about its success.

18      201.    For example, in a July 30, 2004, e-mail, McKesson's John Bonner acknowledged the

19  Scheme's impact on payors and the corresponding benefit to McKesson's clients:

20          We try to "push" the AWP up to 25% above WAC rather than 20%:
    This may cause your customer some short term reimbursement pain

21          with the payors but in the long run, if AWP at First Data Bank goes
    from 20% to 25%, your customer will benefit.[177]

22

23          Most payors reimburse pharmacies at AWP minus 15 to 17%. *The
    higher AWP markup percentage, the more they are paid by the*

24

25

26    [175] MCKAWP 0065895 (January 7, 2002, e-mail from Bob James to Greg Yonko, *et al*.) (emphasis in
    original).

27    [176] MCKAWP 0065592.

28    [177] MCKAWP0076289. The "customer" here is a McKesson retail client.

- 59 -

COMPLAINT
001821-28 451449 V1

1

*insurance company.* Pharmacies barely break even on items with 20% AWPs.[178]

2

3

202. Again in July 2004, McKesson was calculating how much the price increase at

4

Johnson & Johnson had earned one of their clients: "Please see below for the work up of what the

impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years

5

ago J&J products were all 16 ⅔% AWP spread products. Today, almost all of them are 20% spread.

6

Procrit just changed last month."[179]  McKesson concluded that in the third year of the scheme, for

7

Procrit alone, profits tripled, and taking all JOM products together, the effect is "*more than 3 times*

8

*the profit as before*."

9

203. Similarly, in April 2004, when writing to a manufacturer to decline its request to set

10

the mark-up for its products at 20%, James explained:

11

12

> [T]hings have pretty much normalized at a 20% spread (1.25 markup)
> for Brand Rx, which has been extremely beneficial for our
> customers.... Why do you want to take the profitability away from the

13

> retail pharmacies by trying to use a spread of 16 ⅔% when almost all
> other companies are getting a 20% spread. If you have any doubts

14

> about what I am saying, please contact Scott Johnson at Albertsons,
> Dave Vucurevich or Greg Drew at Rite Aid, Frank Seagraves at Wal

15

> Mart, or Frank Scorpiniti at Longs.[180]

16

That McKesson was touting its benefits to Albertsons, Rite Aid, Longs and Wal-Mart in 2004

17

underscores the evidence that the Scheme had long term effects on end payors.

18

**BB.    Evidence from Manufacturers Also Confirms the Existence of the Scheme and the Impact on the Market**

19

204. The McKesson-First Data Scheme is corroborated by evidence from manufacturers.

20

For example, an internal memo from Johnson & Johnson ("J&J") from May 15, 2002, titled

21

"Wholesaler manipulation of AWP" stated:

22

23

> At the recent McKesson meeting Greg Yonko confirmed that
> McKesson was changing average selling price to reflect a higher
> spread on AWP.... McKesson is implementing this change after

24

> companies implement a price increase.... Amerisource Bergen and
> Cardinal have indicated that they are NOT implementing the same

25

26

[178] *Id*. (e-mail string, including July 29, 2004, e-mail from John Bonner to Benjamin Coppolo).

27

[179] MCKAWP 0068131-32 (e-mail string, including July 28, 2004, e-mail from Bob James to Andrew Stubbs, *et al.*).

28

[180] MCKAWP 0071694 (April 20, 2004, e-mail from Bob James to Chad Lucero).

- 60 -

COMPLAINT
001821-28 451449 V1

1    strategy. It is safe to assume that if McKesson is successful and the
     change in AWP is reflected in First Data Bank and Red Book, then
2    ABC and Cardinal will follow.[181]

3    205.    Other J&J documents also recognize that the Scheme caused artificial increases for

4    end-payors, while increasing pharmacy profits:

5        It has come to our attention that pricing services such as First
         DataBank are now adjusting our recommended AWP's based on a
6        WAC + 25% formula. The result is a win for providers (pharmacies)
         since their reimbursement from Medicaid is increased. The state pays
7        more and there is additional pressure on the industry as a whole
         because state expenditure for drugs will increase. This is an artificial
8        price increase and setting of the AWP is out of our hands.[182]

9    206.    J&J drafted an internal memo in which it addressed First Data's unauthorized

10   increase of J&J's mark-up to 25%. It observed:

11       Since AWP is the basis for reimbursements in many segments, this
         action will increase the strain on multiple payers. The inflated AWPs
12       would benefit pharmacists under Medicaid payment procedures and
         since AWP is the primary basis of Medicaid reimbursement, the
13       impact to states could be significant.

14                                      * * * *

15       When probed by various J&J contacts, FDB provided contradictory
         responses ... ranging from: the use of survey methods and techniques
16       have not changed: the data is what it is.... to the other end of the
         spectrum .... it was a deliberate action: "J&J will be a +25%
17       company" as would other 20% companies to standardize data
         collection and reporting requirements on FDB. There was not much
18       detail provided regarding survey techniques. J&J trade relations
         believe the major wholesalers are surveyed and two out of the three
19       majors would be enough to change the price point. From a wholesaler
         perspective the theory exists that this would be a way to enamor
20       themselves with the retail pharmacies, as greater profits would be
         realized by the pharmacists.[183]

21   207.    A Bristol Myers Squibb presentation also observed the changes, but assumed that it

22   was all First Data's doing:

23

24

25   [181] MDL-OBI00002828-39; *see also* MDL-OBI00040610-15 (May 13, 2002, J&J e-mail with attachments
     showing that ABC, Cardinal and McKesson each had 20% mark-ups for Procrit and Epogen, but noting "Bob
26   James confirms that AWP for both PROCRIT and Epogen will be moving to cost x 1.25 in the near future.").

     [182] MDL-JJ00000110.
27
     [183] MDL-CEN00103686 (Ortiz exhibit 001). Ms. Ortiz testified that the memo represented a summary of
28   her research into the question of the AWP reporting issue. Ortiz Dep. at 88:14-20.

                                         - 61 -

     COMPLAINT
     001821-28 451449 V1

First Data Bank has changed the way they create AWP. In the past, some manufacturers list prices was marked up 20.5%, others 25% based on the product labeler code. Now, concurrent with price increases, 25% mark-up is being applied, regardless of historical precedence.[184]

208. The same is true about AstraZeneca, which observed:

Recently, FirstDataBank [sic] has independently begun to revise the AWP for all branded pharmaceutical products to a 25% markup. We have been informed that FirstDataBank [sic] is taking this action to create consistency in price reporting. For AstraZeneca products with a 20% spread, the spread will increase to 25% at the time of the WAC price change, beginning on January 1, 2002, or by the end of the 1st Qtr 2002, even if the price change was not changed. We have seen the change to AZ and other companies' products that had price changes in 2002.

### How the spread changes could impact the industry and healthcare system

- Price perceptions – AWP is sometimes used to compare prices so a higher spread appears to inflate the prices of pharmaceutical products. As an example, the new AWP price for Nexium 40 mg capsules is $4.32 – it would have been $4.14 without the spread changes.

- Pharmacy reimbursement – a higher spread can translate into higher reimbursement to retailers and mail order pharmacies to the extent a reimbursement formula for private third party and Medicaid RX's is anchored off of AWP.

* * * *

- Price comparisons – since AWP is sometimes used to compare the prices of competing products the change in spread will cause price differences to appear greater or lesser depending on the specific situation…. However, according to FirstDataBank [sic] the spread for all branded drugs will be changed to 25% by the end of the 1st Qtr 2002.[185]

209. First Data kept the ruse alive when it told Aventis that "wholesalers" were driving the changes:

First DataBank has advised me that after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to WAC spread. As a result First DataBank has determined to employ a higher 25% AWP to WAC spread for all Aventis products. This will be implemented as we have price changes. Immediately *the entire line of Allegra will be moved to a 25% spread from its current*

---

[184] BMS/AWP/01109780.

[185] AZ 00461109 (Freeberry, Exhibit Q, identified, Freeberry Dep. at 114:14-19).

COMPLAINT
001821-28 451449 V1

1
2

> *20%.* This will be effective immediately. The most noticeable will be that it will be more profitable for the retail pharmacist to dispense Allegra.[186]

3       210.    Although they ultimately did nothing about it, many of the manufacturers objected to

4    the increases.[187]

5    **CC.    The Other Major Wholesalers – Amerisource Bergen and Cardinal – Declined to Manipulate AWP or Participate in any Scheme With First Data**

6
7    **1.    While Cardinal and ABC faced the same pressures as McKesson to increase profit margins for their pharmacy customers, they did not manipulate AWP**

8       211.    Although wholesaler prices are based on WAC, not AWP, wholesalers maintain

9    AWPs for their customers' benefit to allow them to calculate their reimbursement.[188]

10      212.    But even though other wholesalers like ABC and Cardinal provided AWP

11   information to their customers, they refrained from engaging in any scheme with First Data or

12   otherwise manipulating pricing data.

13              **a.    Cardinal**

14                        **(1)    Where possible, Cardinal set its "Reference Price" based on what manufacturers told Cardinal**

15      213.    Like McKesson's Suggested Sell Price, Cardinal has a sell price in its "Master Item

16   File" or "MIF" database called Cardinal "Reference Price."

17      214.    Unlike McKesson, which revised its Suggested Sell Price without regard to

18   manufacturer suggestion in order to increase First Data's published AWPs, Cardinal always relied

19   on the manufacturer suggested price or historical mark-up and applied a default mark-up only if it

20   had no mark-up information.

21
22
23
---

[186] AV-BCA-0010336 (emphasis in original).

24   [187] *See, e.g.,* MDL-OBI00002617 (J&J); Deposition of John Freeberry (May 20, 2004) at 118:11-120:18; 125:7-15 (AstraZeneca). FDB-AWP 053695 at FDB-AWP 053697(GlaxoSmithKline); *see also* MCKAWP 0068863 (Morgan e-mail to James, dated April 30, 2002: "ARGHH!!!!! Lilly told our CEO and COO we were setting AWP.").

25
26   [188] *See, e.g.,* MCKAWP 0084291 ("Regardless of where product management says the customer should get the AWP, the fact of the matter is that a lot of them I am sure use the AWP from our system for reimbursement. And yes, this [discrepancies between McKesson's list prices and what the vendors or FDB list as the AWPs] would definitely be a problem.").

27
28

- 63 -

COMPLAINT
001821-28 451449 V1

**(2)  Cardinal ensured that its AWP Reference Price would not be confused with FDB's AWPs**

215.  Cardinal took pains to ensure that its Reference Price was not confused with actual published AWPs. Historically, Cardinal published a "Corporate AWP" or "Cardinal AWP." In approximately 2000, Cardinal began reconsidering the label "Corporate AWP" because the field was based on vendor information, not a calculation of an average, as the name "AWP" suggested.

216.  Cardinal decided to call its sell price "Reference Price" because it did not want to be presumed to be a party that sets AWPs.

**(3)  Cardinal never responded to First Data "surveys"**

217.  Cardinal was largely unaware of First Data's wholesaler surveys until about 2000. An internal Express Scripts document from 2002 reflects that representatives from Cardinal told employees at Express Scripts that they believed First Data surveyed three wholesalers: McKesson, AmerisourceBergen, and D&K.[189]

218.  It has been Cardinal's policy since at least 1998 never to share its pricing information with third parties, including First Data. Thus, Cardinal not only refused to participate in First Data's "surveys," but, other than forwarding manufacturer price announcements, also refused to provide First Data pricing information at all.

219.  Cardinal's policy of non-disclosure was well-enforced. Cardinal was aware of only a single instance in which a Cardinal employee had provided AWP information to First Data. After that incident occurred, the employee was instructed never to do so again, and Cardinal held a meeting at which this message was conveyed.

220.  Notes from an internal First Data meeting on June 7, 2000 – over a year before the Scheme began – confirm that Cardinal informed First Data that it did not want to take part in its survey:

> Steve is saying that Cardinal didn't want to participate in [FDB's] survey. Kay [Morgan] wants to continue to include Cardinal…. Doesn't know if they want to be in the position of setting AWP [in

---

[189] ESI-414-00004275.

- 64 -

COMPLAINT
001821-28 451449 V1

1

case] Cardinal heard back from their customers that they are setting the wrong AWP.[190]

The notes also identify, as First Data's contact for Cardinal, the same Cardinal employee who was rebuked for violating Cardinal's policy of disclosing unpublished pricing information.[191]

221.   Although Kay Morgan could not recall when it occurred, she conceded that Cardinal asked her to stop calling about pricing information.[192] She further conceded that the only mark-up information that she received from Cardinal after that point was limited to instances in which there was a product that Cardinal wanted listed that was not carried by any other wholesalers.[193]

222.   FDB's document production further undermines its contention that it relied on Cardinal's involvement in the survey process. FDB produced three written surveys which purport to show Cardinal involvement. All three pre-date the August 2001 start of the Scheme. Two are dated in April 2000, within a few months of the FDB meeting in which the errant Cardinal employee is identified as FDB's contact from Cardinal, and in which it is conceded that Cardinal does not want to participate in FDB's surveys.[194] A third is dated May 14, 2001, three months before the Scheme began. However, in this latter document FDB's third person reference to Cardinal, *i.e.* "Cardinal – uses manufacturer suggested AWP" stands out in contrast with its second person references to Bergen and Amerisource, *i.e.*, "Bergen – Use AWP provided by Lilly, let us know if you think we should reconsider this," and "Amerisource – Unusual. We have 1.20 for 00002, but the NDCs in question are 1.25."[195] FDB's use of the third-person to describe Cardinal's position suggests that it is not referencing Cardinal's personal response to the May 2001 survey, but rather representing what it understood to be Cardinal's pricing policy.

223.   This attempt to include Cardinal's pricing policy as part of the AWP calculation was inconsistent with Cardinals' clear intention that it did not want to take part in the survey or

[190] FDB-AWP 028338 at 28340.

[191] *Id.* at 28338.

[192] Morgan Dep. at 49:4-6.

[193] *Id.* at 55:8-58:1.

[194] FDB/NEC 018527; FDB/NEC 018521, compare FDB-AWP 028338-42 (FDB meeting notes).

[195] FDB/NEC 015320. There is no verb and thus no reflection of person in FDB's reference to McKesson, *i.e.*, "McKesson – 1.20."

- 65 -

1  otherwise influence AWP pricing. And even Kay Morgan conceded that she continued to try to call

2  Cardinal for mark-up information even after she had been asked not to call, which is inconsistent

3  with her professed belief that she had clear instructions from Cardinal as to how to include their

4  pricing policy in a wholesaler survey.[196]

5  224.  The testimony of Alisha Nielson, who, with Kay Morgan, was solely responsible for

6  updating First Data's mark-up database, is also consistent with Cardinal's lack of involvement.[197]

7  While she testified that First Data "looked to Bergen, Cardinal and McKesson" in the 2001-2005

8  period for mark-up information,[198] Ms. Nelson admitted that she did not know whether First Data

9  had any contacts at Cardinal for wholesaler surveys in this period.[199]

10  225.  Thus, First Data was not surveying Cardinal, one of the "Big Three" wholesalers, at

11  any time during the Scheme.

12  **(4)  Cardinal refused to respond to customer pressures to raise its mark-up**

13
14  226.  Nor did Cardinal otherwise manipulate prices. In October 2002, Cardinal sales

15  representatives were complaining that their customers were concerned because the AWPs Cardinal

16  listed were lower than the AWPs listed by its competitors, yet Cardinal refused to become involved

17  in any price manipulation. Similarly, documents from the PBM, and Express Scripts, indicate that

18  when Cardinal was approached by a pharmacy and asked to increase its mark-up, Cardinal refused

    to do so.[200]

19  227.  Even when Cardinal received calls from customers after the Scheme had taken effect,

20  it maintained its pricing policy.

21
22
23
24
25  [196] Morgan Dep. at 287:7-289:2.

26  [197] 5.18.07 Deposition of Alicia Nielsen at 53:7-19; 60:5-8; 131:5-19.

    [198] *Id.* at 70:11-17.

27  [199] *Id.* at 165:10-24.

28  [200] *See* ESI-414-00004275; *see also* ESI-414-00003844.

- 66 -

b. **AmerisourceBergen**

(1) **AmerisourceBergen based its AWPs on manufacturer information and, when that source dried up, on First Data's AWP**

228. ABC was the product of an August 2001 merger of AmeriSource and Bergen Brunswig. The AmeriSource legacy company used a formulation called "AAS AWP," which was similar to McKesson's Suggested Sell Price, and Bergen's legacy company had one called "BBCWP."

229. ABC utilized the historical mark-up because it believed AWP should be standardized throughout the industry.

230. When AmeriSource and Bergen Brunswig merged to form ABC, ABC conducted a reconciliation to ensure that all of its AWPs, and the methods by which they were calculated, were the same. Although ABC found it difficult to manually enter AWP changes, ABC never considered standardizing all of its mark-ups in order to make the process easier.

(2) **ABC never responded to First Data "surveys"**

231. ABC is not aware of anyone ever being surveyed by First Data, responding to surveys, providing any type of pricing information to First Data, or providing First Data with ABC's method for calculating its proprietary AWP.[201]

232. Similarly, there are no FDB survey documents, from any time during the Scheme, purporting to show ABC (or its predecessors, Bergen and Amerisource) participating in the survey process. Alisha Nielson conceded that during the merger, acquisition, and subsequent layoffs of ABC employees, FDB was not getting sufficient information from ABC.[202]

233. In October 2003, First Data held a conference call with ABC, hoping to convince ABC to participate in FDB surveys, but was unsuccessful.[203]

---

[201] Affidavit of Denny Lindell (Mar. 1, 2006) (describing results of investigation).

[202] Nielson Dep. at 96:11-97:8.

[203] Morgan Dep. at 242:4-243:1; *see also* FDB/NEC 032851; *see also* FDB/NEC 032852-53 (internal FDB e-mail, dated September 15, 2004, discussing FDB's negotiations with ABC to provide pricing data).

- 67 -

**(3) Despite pressure from its customers to raise its mark-up, ABC adhered to manufacturers' historic mark-ups**

234. Like Cardinal, ABC, too, faced pressure from its customers to raise its AWPs. Nonetheless, ABC never considered using a standardized mark-up of its own choosing.

235. Even after the Scheme took effect, ABC resisted adopting First Data AWPs for years.

**DD. As the foreseeable and intended result of McKesson's Scheme, Virginia Medicaid overpaid its Pharmacy providers for the Marked-Up Drugs**

236. As a result of the fraudulent scheme alleged herein, defendants and their co-conspirator First Data knowingly created a false record, conspired and caused providers such as chain retail pharmacies to submit fraudulent claims to Plaintiff during the relevant time period and continuing until the September 2009 rollback of the inflated prices. Each such fraudulent claim caused a continuing series of similar, independent injuries to Plaintiff.

237. The conspiracy alleged herein continued until First Data rolled back the fraudulent and inflated AWP markups on September 26, 2009. Accordingly, the last overt act committed, in support of the conspiracy to defraud Plaintiff and other payors, was the final transmission of fraudulent AWPs in late September 2009 prior to the rollback. This was the culminating act in defendants' conspiracy to defraud Plaintiff which began with the first tortious act in furtherance of the conspiracy in 2001, as alleged herein.

**EE. American Pipe Tolling**

238. On August 7, 2008, a class action was filed by Douglas County, Kansas on behalf of a national class of governmental entities, including Virginia. Plaintiffs moved to certify the class on July 1, 2009. While the matter was still pending before the Court, the plaintiffs withdrew their request for certification of the Medicaid class, and Montana and Oklahoma continued to litigate their claims as individual claimants.[204]

239. The Commonwealth of Virginia's RICO claims are based on the same conduct as that alleged in the original class action lawsuit filed on August 8, 2008, and thus relate back to that

---

[204] Douglas County Plaintiffs Notice of Partial Withdrawal of Plaintiffs' Motion to Certify (*San Francisco Health Plan v. McKesson*, Case No.: 1:08-CV-10843-PBS, Dkt. No. 106).

COMPLAINT
001821-28 451449 V1

1    date for the purpose of any statute of limitations defenses to the RICO claims. *American Pipe &*

2    *Construction Co. v. Utah*, 414 U.S. 538, 554 (1974).

3    **FF.    Tolling Agreement**

4        240.    The Commonwealth of Virginia entered into a tolling agreement with McKesson

5    effective May 12, 2009, attached as Exhibit B. Under the terms of the agreement, "[a]ll time-related

6    defenses applicable to" the State's "civil or criminal claims relating to the reporting to First DataBank

7    of" McKesson's "drug pricing information, including markups," are tolled, and that for the purposes

8    of such defenses, the tolling period would be excluded from the calculation of time.[205]  On May 9,

9    2011, Virginia gave notice of termination of the tolling agreement, effective June 8, 2011.

10   **GG.    Fraudulent Concealment**

11       241.    Defendants and their co-conspirator cleverly hid their conduct behind First Data's

12   confidential survey process to avoid detection and to preserve, for as long as possible, the benefit

13   they had conferred to the pharmacies. Their conduct was further obscured because First Data stored

14   its markup information separately from its database of published prices *and generally increased the*

15   *markup on individual drugs only when the manufacturer announced a change to the WAC.*[206]

16   For example, when Bob James e-mailed First Data to ask Kay Morgan if she would "check the

17   AWP for Remicade," Alisha Nielson responded:

18           Hi Bob,

19           They (Centocor) are a 25% company. However, they have not had
             any price changes on this Remicade product since 2001 ... prior to the
20           mark up. I'll bring this to Kays attention. Not sure if [she] would
             want to take action on it right now because it would trigger a lot of
21           questions on why there was a change to the item when the MFG
             hasn't sent any price changes.

22           Have a wonderful day!

23           Alisha Nielsen[207]

24

25       [205] May 12, 2009, Tolling Agreement between McKesson and the Medicaid Fraud Control Units
26   of the several states and/or Commonwealths, ¶¶ 3-4.

         [206] Nielsen Dep. at 84:16-85:3; 158:2-7; *see also* MCKAWP 0069609 (explaining the delay between the
27   change in markup and when it takes effect with the announcement of price changes).

28       [207] MCKAWP 0071440.

- 69 -

COMPLAINT
001821-28 451449 V1

242.     Because the artificial markup increases were taken at the same time and overshadowed by the manufacturers' published WAC increases, most payors were unaware of any markup increases and attributed the overall increases to manufacturer price hikes.

243.     Additionally McKesson and FDB made affirmative misrepresentations or material omissions about their role in the Scheme, including without limitation, falsely attributing markup increases to the wholesaler industry as a whole, as opposed to McKesson's secret normalization agenda.[208] First Data continued to make false or misleading statements about the integrity of its data and the means by which it calculated its AWPs.[209] First Data also kept McKesson's participation in the process secret by refusing to disclose the alleged survey results on alleged grounds of confidentiality.[210] Additionally, when asked directly whether First Data was in the process of normalizing markups, First Data not only denied this and demanded to know the source of this "rumor," but forwarded its response to McKesson's Bob James, who responded: "I love it! You're the best."[211]

244.     Both James Boyd of FDB and Mark Pulido of McKesson were panel members at the January 2004 Abt Associates Expert Panel Meeting, which discussed, among other things, changes to the markups.[212] No other data publisher or wholesaler was represented on the panel. Even though the report from that meeting concluded that "[t]here is evidence to suggest that a number of drug manufacturers increased the AWP: WAC ratio for the vast majority (90% of more) of their

---

[208] *See, e.g.,* AVA-BCA-0010336.

[209] For example, FDB-AWP 02005 (page from First Data's website, dated November 4, 2002) (stating that First Data surveys each of the national wholesalers to determine markup), which Kay Morgan acknowledged was never a true statement of First Data's survey practice. Patricia Kay Morgan 6.28.07 Dep. at 100:16-23.

[210] *See, e.g.,* FDB-AWP 053695 at FDB-AWP 053697 (March 1, 2002, letter from GlaxoSmithKline complaining of the markup increases: "First DataBank has not been willing to share any information regarding that survey or to disclose any other data that might form the basis for this change in the formula. We were informed that First DataBank considered the data to be proprietary. We were also told by certain of your personnel that, because First DataBank alone sets AWP, we had no standing to request an explanation from First DataBank for the extent of these increases in AWP."); Freeberry Dep. (May 20, 2004), at 114:18-24 (regarding AstraZeneca's efforts to address FDB's unauthorized increases of its markups: "Q: Have you ever reviewed any of the wholesaler surveys that First DataBank purportedly did? A: I asked for them; they weren't provided.").

[211] MCKAWP 0069588.

[212] P09763-73.

COMPLAINT
001821-28 451449 V1

1    drug products between October 2001 and July 2002," neither McKesson nor FDB gave any

2    indication that they, rather than the manufacturers, were responsible for the mark-up increases.[213]

3    Indeed, the representative of CMS who sat on that panel has testified under oath that he does not

4    recall discussing McKesson's or FDB's role in the Scheme at any time before at least 2005. [214]

5    245.    Similarly, in a conference call with Aetna in September 2004, McKesson flatly

6    denied that it had any control over rising AWPs,[215] while at the same time it bragged to select

7    customers that McKesson had "done [its] part" to increase AWPs through increased markups.[216]

8    Nor did McKesson publicly reveal its normalization scheme, knowing that if the increases were

9    revealed, managed care would renegotiate with retail pharmacies and McKesson's "gift" to retailers

10    would be lost.[217]

11    246.    For its part, McKesson's co-conspirator First Data falsely represented to Attorneys

12    General and Medicaid agencies in March 2004 that FDB calculated its AWPs "based on surveys of

13    drug wholesalers and manufacturer supplied information for a drug product,"[218] and gave false

14    assurances that "FDB, of course, does not set drug prices."[219]

15    247.    In addition, in the AWP litigation brought by payors against manufacturers for

16    fraudulently inflating AWPs, McKesson actively concealed its separate, AWP-related fraud by

17    denying under oath that it had anything to do with setting AWPs. McKesson submitted the

18    September 2004 declaration of Kimbir Tate of McKesson's legal department, testifying that

19    McKesson was "unaware" of its role in the publication of AWPs and "unaware" that it participated

20    in any pricing surveys by publishers.[220] Bob James, McKesson's architect of the scheme, falsely

21    testified that he would have only rarely provided markup information to FDB, and that there was no

---

[213] P09771.

[214] 11.18.10 Deposition of Larry Reed at 102: 4-103: 12.

[215] MCKAWP 0078652.

[216] MCKAWP 0065895.

[217] MCKAWP 0065895.

[218] CONN_MCK 020682-0702 at CONN_MCK 020688.

[219] *Id.* at CONN_MCK 020683.

[220] 9.4.04 Declaration of Kimbir Tate, ¶¶ 6-7.

- 71 -

intentional correlation between McKesson's increase of the markups for its suggested sales prices and FDB's published AWPs.[221] As James' supervisor and the recipient of many e-mails and memos from him, Yonko was well-informed of James' interaction with FDB and the progress of the scheme, yet testifying as McKesson's 30(b)(6) witness on pricing issues, Yonko falsely claimed that as far as he knew "nobody keeps track of AWP at McKesson"[222] and he was unaware of the content of the discussions James had with FDB.[223] Further, Yonko, co-author of McKesson's official position paper on AWP, falsely testified that he knew nothing about AWP or the process by which FDB derived its AWPs.[224] All of these statements were false in light of the evidence and constituted perjury. Indeed, Yonko later changed his testimony at his subsequent deposition in the *Carpenter's* lawsuit to acknowledge that AWPs did matter to McKesson and to concede that McKesson "attempted to raise AWP's to support our customers, by changing our markup in our system, going through the First DataBank survey process, and hoping that, in fact, the AWP's will change."[225]

248. Furthermore, in a March 15, 2005 letter, First Data announced that its purported survey method of determining AWPs would be discontinued, but it did not disclose the Scheme or otherwise inform the public that its AWPs were the product of manipulation by First Data and McKesson. On the contrary, reviewing its past practices with respect to establishing AWP, First Data restated that it had conducted surveys to establish AWPs:

March 15, 2005

Re: First DataBank's Blue Book AWP Data

Dear Customer:

---

[221] 2.23.05 Deposition of Robert James at 48:9-13 and 104:3-12; 106:5-14. The evidence is legion that McKesson actively coordinated price changes with FDB.

[222] 10.14.04 Deposition of Greg Yonko ("10.14.04 Yonko Dep.") at 63:1-2. Yet communications subsequently produced by McKesson in the Carpenter's litigation confirmed that McKesson took a very active interest in tracking AWPs, including weekly comparisons of FDB's published AWPs and McKesson's suggested AWPs, and that Greg Yonko was directly involved in the process.

[223] 10.14.04 Yonko Dep. at 109:1-21.

[224] *Id*. at 74:12-18 and 76:7-20.

[225] 5.15.07 Yonko Dep. at 41:8-14.

- 72 -

1
2
3

> It is our pleasure to serve you as a customer of First DataBank. We are writing to make you aware of upcoming changes to First DataBank's National Drug Data File Plus™ database, or NDDF Plus™, that may impact your use of our products.

4
5
6
7
8
9
10

> In order to publish various drug pricing data fields available through its NDDF Plus database and related products, First DataBank has historically relied on drug manufacturers and wholesalers to report or otherwise make available information concerning their list price for drugs. Unfortunately, First DataBank is no longer able to obtain information relating to list prices directly from wholesalers in a manner that is consistent with First DataBank's editorial standards and policies. In fact, it is our understanding that some wholesalers often do not use catalog or list prices as a basis for determining actual transaction prices. As a result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

11
12
13
14
15
16
17

> First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. ***First DataBank periodically surveyed full-line national wholesalers to determine the average mark-up applied to a manufacturer's line of products. The average mark-up of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)*** or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value.[226]

18
19
20
21

Further, First Data made the deceptive claim that it had identified a standardized markup of 25% for brand drugs as determined by the prices it published in the years 2001-2004 – when in fact this was the very time that it altered the markups on brand drugs pursuant to it and McKesson's scheme to inflate AWPs.[227]

22
23
24
25
26

249. Plaintiff discovered the existence of the combination and conspiracy alleged herein when it learned of the FDB settlement. Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein sooner by the exercise of reasonable due diligence because of the deceptive practices and secrecy employed by McKesson and its co-conspirator First

27  [226] MCKAWP 0054057.

28  [227] MCKAWP 0054058.

- 73 -

COMPLAINT
001821-28 451449 V1

1  Data to avoid detection and their affirmative concealment of such violations. Indeed, with respect

2  to its role in the scheme, McKesson even committed perjury to keep it secret.[228]

3    250.    Virginia did not have access to contemporaneous information that would have

4  allowed it to evaluate whether defendants' claimed justifications for the price increases were valid.

5    251.    Moreover, by its nature, defendants' conspiracy was inherently self-concealing, and

6  indeed the success of the conspiracy depended on its self-concealing nature.

7    252.    Because the alleged scheme was both self-concealing and affirmatively concealed by

8  defendants, Virginia had no knowledge of the alleged scheme, did not know that false claims were

9  being presented, and had no knowledge of any facts or information that would have caused a

10  reasonably diligent person to investigate whether such a scheme existed.

11    253.    Because defendants actively concealed their conspiracy to prevent Virginia from

12  suing them for the conduct alleged herein, defendants are equitably estopped from asserting that

13  any otherwise applicable limitations period has run.

14    254.    As a result of the active fraudulent concealment of the conspiracy, Plaintiff asserts

15  the tolling of the applicable statute of limitations affecting the causes of action.

16                    **V.    CLAIMS FOR RELIEF**

17                        **COUNT I**

18                      **CIVIL RICO**
                     **(18 U.S.C. § 1962(c))**

19                    **(against McKesson)**

20    255.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

21  and further allege as follows.

22    256.    McKesson violated 18 U.S.C. § 1962(c) by associating with an enterprise that

23  engaged in a pattern of racketeering activity.

24    257.    Plaintiff, McKesson, and First DataBank are each "persons," as that term is defined

25  in 18 U.S.C. § 1961(3).

26

27

28  _____
    [228] *See supra* ¶ 245.

- 74 -

COMPLAINT
001821-28 451449 V1

258. At all relevant times, McKesson, along with its co-conspirator, First Data, conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

**A.      McKesson and First Data Formed an Association-in-Fact RICO Enterprise**

259. For purposes of this claim, certain RICO "enterprises" are associations-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of (a) First Data and (b) McKesson, including their directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "McKesson-First Data Enterprise." The Enterprise is an ongoing and continuing organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the Scheme; (c) achieving economic benefits from the activities of the Enterprise; and (d) causing payors to make payments based on the dissemination of fraudulent AWPs as a benchmark for reimbursement in the pharmaceutical industry. First Data and McKesson each had a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs.

260. McKesson initiated the Scheme and provided FDB with the information necessary to carry it out, including but not limited to, its proposed mark-up, current WACs, and its weekly FDB AWP comparison charts to chart the progress of the Scheme. FDB published the inflated AWPs and kept up the ruse that the AWPs were the result of an objective survey process. It coordinated with McKesson to disguise the Scheme, including but not limited to, claiming that the results of its alleged surveys could not be disclosed on the grounds that they contain proprietary information and by falsely representing that the changes were attributable to government investigation of AWPs and generalized movements in the pharmaceutical industry as opposed to McKesson and FDB's collusion.

261. The Enterprise functioned as a continuing unit as evidenced by the continuing coordination of activities between McKesson and First Data, including communications on a regular basis for all times relevant to this lawsuit, including August 1, 2001, through March 15, 2005.

- 75 -

COMPLAINT
001821-28 451449 V1

1  Typically these communications occurred by use of the wires and mails, in which McKesson and

2  First Data discuss and agree on the implementation of the mark-up scheme for a given drug or

3  product line. McKesson and First Data functioned as a continuing unit for the purposes of

4  implementing the Scheme. When issues arose during the Scheme each agreed to take actions to

5  hide the Scheme and to continue its existence.

6  **B.    McKesson Associated with the Enterprise**

7      262.    Both First Data and McKesson were willing participants in the McKesson-First Data

8  Enterprise; each had a common purpose and interest in the establishment and operations of the

9  Scheme. They also agreed to the manner in which the McKesson-First Data Enterprise would be

10  conducted, *i.e.*, through McKesson's transmission of increased mark-ups and First Data's

11  publication of those mark-ups. This organizational structure was the basis on which the McKesson-

12  First Data Enterprise operated.

13      263.    At all relevant times, First Data and McKesson were generally aware of each others'

14  conduct in furtherance of the Scheme, were knowing and willing participants in that conduct; and

15  incurred benefits as a result. McKesson and First Data initiated the Scheme in 2001-2002,

16  continued to change markups in 2003-2004, and continued to publish the false AWPs through 2009.

17      264.    As the creator of the McKesson-First Data Enterprise and the principal architect of

18  the plan to defraud, McKesson was keenly aware of the existence of the enterprise, its purpose and

19  its activities. McKesson has acknowledged that it inflated the mark-ups for its suggested sell prices,

20  beginning in 2000, in order to influence the published AWPs. McKesson also regularly discussed

21  the Scheme with First Data in wires, e-mails, and in telephone conversations and monitored its

22  progress, including through weekly AWP comparison reports.

23      265.    First Data was aware that McKesson's mark-ups were false and that its own

24  published AWPs were inflated by the Scheme. This awareness comes from the following sources:

25  First, McKesson informed First Data that it was artificially inflating the mark-ups to a uniform 25%.

26  Second, prior to the Scheme, First Data had in some instances obtained mark-ups from wholesalers,

27  which made First Data aware, even in the absence of McKesson's direction communication, about

28  the artificial nature of McKesson's pricing information and the inaccuracy of its reported AWPs.

- 76 -

1    Third, as various governmental entities reported on AWP inflation, First Data did not confirm the

2    accuracy of the AWPs that First Data used. Fourth, First Data stopped conducting even limited

3    surveys of other wholesalers and simply accepted the Scheme, when it knew there was no basis for

4    the 5% mark-up. Fifth, First Data actually received letters from certain manufacturers stating that

5    the 5% increase in AWP was not justified.

6        266.    The Scheme went to the point where FDB would query McKesson whether there had

7    been a WAC increase so that a given drug could go to a 25% mark-up. Thus, both McKesson and

8    FDB conspired to implement the Scheme.[229]

9    **C.    The Enterprise Affected Interstate Commerce**

10       267.    The McKesson-First Data enterprise affected interstate commerce because it

11   increased AWPs, a nationally recognized benchmark for the purchase price of brand-name

12   prescription drugs. Pharmacies are reimbursed by health plans and other pharmacy benefit

13   providers based on AWP. Under this system, a higher WAC-to-AWP spread results in increased

14   profits to pharmacies. Thus, McKesson and First Data helped deliver greater profits to pharmacies

15   nationwide by conspiring to increase AWPs. And they caused consumers and TPPs to pay more.

16       268.    In the underlying litigation on behalf of private payors, McKesson's expert, Joseph

17   Kalt, admitted that "McKesson's higher SSPs ("suggested sales prices") led to higher AWPs

18   published by FDB."[230]

19       269.    This was also acknowledged in McKesson's internal mails, as set forth herein, where

20   McKesson's executives discussed the positive impact of "normalizing" on McKesson's customers

21   and its efforts to discretely "market" its activities to select customers.

22   **D.    McKesson Conducted the Affairs of the Enterprise**

23       270.    McKesson participated in the affairs of the McKesson-First Data Enterprise and not

24   just its own affairs. In its own words, McKesson described itself as the "driving" force behind the

25   Scheme and acknowledged that, without its efforts, the Scheme never would have succeeded.[231] It

26   ―――――――――――――
[229] MCKAWP 0069553.

27   [230] Report of Joseph Kalt (January 28, 2008) Report at 16.

28   [231] MCKAWP 0065895.

- 77 -

1  provided First Data with its mark-ups and product price increases to implement the increased mark-

2  ups; ran weekly comparisons of its list prices and First Data's AWPs; worked with First Data to

3  point out "problem suppliers;" and helped to conceal the Scheme. Each of these actions was

4  necessary to, or helpful in, the operation of the McKesson-First Data Enterprise to carry out its goal

5  of disseminating false price information.

6      271.   McKesson has exerted control over the Enterprise, and, in violation of Section

7  1962(c) of RICO, McKesson has conducted or participated in the conduct of the affairs of those

8  RICO enterprises, directly or indirectly, in the following ways:

9          a.   Both McKesson and First Data had a degree of control concerning the WAC-

10             to-AWP mark-up and the AWPs that First Data reported;

11          b.   First Data has directly controlled the creation and distribution of marketing,

12             sales, and other materials used to inform end payors as to the value of its

13             services;

14          c.   McKesson intended that First Data would (and did) distribute its publications

15             containing false AWPs through the U.S. mails and by interstate wire

16             facilities; and

17          d.   First Data allowed McKesson to exert control over its organization, knowing

18             that the AWPs were inflated as a result of the Scheme and were not real

19             numbers. McKesson controlled First Data by virtue of its ability to cause an

20             increase in the WAC-AWP mark-up. First Data did so because the reporting

21             of AWPs was, and is, a major part of its business, and McKesson was integral

22             to First Data's AWP reporting and to increasing First Data's profits for the

23             reasons set forth herein.

24      272.   The McKesson-First Data Enterprise had a hierarchical decision-making structure

25  headed by McKesson. McKesson issued instructions on how the WAC-to-AWP mark-up was to be

26  reported and each Publisher accepted those instructions despite knowing of their falsity.

27

28

- 78 -

273. In violation of Section 1962(c) of RICO, McKesson conducted the affairs of the McKesson-First Data Enterprise with which it associated by fraudulently increasing certain AWPs by 5% that First Data then published and disseminated nationwide.

**E.     The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail or Wire Fraud Violations**

274. The Scheme consisted of a pattern of uniformly raising mark-ups on roughly 400 brand drugs to 25%. The markup increases on each of the hundreds of drugs was carried out over a three-and-a-half-year period, and publication of the fraudulent AWPs for the over 1400 NDCs that were affected continued for eight years until the rollback in late September 2009. The alteration of the mark-up for these drugs and the continued publication of false AWPs derived from these artificial markups was carried out through the McKesson-First Data Enterprise. McKesson used its position to induce First Data to adopt its proposed mark-up for all brand drugs and to monitor First Data's progress in increasing the brand markups and disseminating the false prices, as well as to capitalize on the benefits of this Scheme by boasting to select retailers of its role in the AWP increases.

275. The nature and pervasiveness of the Scheme, which was orchestrated out of the corporate headquarters of McKesson and First Data, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

276. McKesson and its co-conspirator's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and other end payors. Each separate use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff. McKesson and First Data have each engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular McKesson-First Data Enterprise.

277. Both McKesson and its co-conspirator, First Data, conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. This

- 79 -

pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). These activities include the use of the mail and wire services both to implement the markup increases on the Marked Up Drugs and to disseminate falsely inflated AWPs for these drugs. Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which McKesson intended to defraud Plaintiff and other intended victims.

278.    Many of the precise dates of McKesson's and First DataBank's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to their books and records. Indeed, an essential part of the successful operation of the Scheme alleged herein depended upon secrecy, however, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme. Plaintiff describes this as follows.

1.    **The McKesson-FirstDataBank Enterprise engaged in a Scheme to defraud Public Payors**

279.    McKesson's pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. McKesson's fraudulent Scheme consisted of, *inter alia*: deliberately causing falsely inflated AWPs to be published or disseminated so that Plaintiff and other end payors would pay excess charges for the drugs that are the subject of this lawsuit.

2.    **McKesson specifically intended to defraud Public Payors**

280.    McKesson's own documents, as well as the testimony of its officers, reveal that it intended to defraud end payors, including Medicaid agencies, by raising AWPs; that it maintained the inflated mark-ups in its system for this purpose; and that it worked closely with First Data to increase brand AWPs over time. By contrast, McKesson's competitors, ABC and Cardinal, refused to change the manufacturers' historic mark-ups even though they were pressured by retailers to do

- 80 -

so, and even refused to take part in any First Data survey out of concern that they might be perceived as setting AWPs.

### 3. The Enterprise made use of the U.S. mails and interstate communications in furtherance of this Scheme

281. McKesson and First DataBank's use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the time period including August 1, 2001 through March 15, 2005, including, *inter alia*:

a. Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

b. Written representations and telephone calls between McKesson and First Data regarding mark-ups and AWPs, which occurred on a regular basis each year;

c. Hundreds of e-mails between McKesson and First Data agreeing to, or effectuating the implementation of, the Scheme. These e-mails included, but are not limited to, the e-mails identified earlier in this Complaint;

d. Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

e. Receipts of increased profits or other economic benefits obtained as a result of the Scheme – the wrongful proceeds of the Scheme – sent through the U.S. mails and interstate wire facilities; and

f. In addition to the above-referenced RICO predicate acts, it was foreseeable to McKesson that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, McKesson has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local

- 81 -

1    headquarters or divisions. These uses of the U.S. mails include some of the

2    documents referenced in this Complaint.

3    282. These communications by U.S. mail or wire were made for the purpose of carrying

4    out the Scheme or hiding it from Plaintiff and other end payors. The McKesson-First Data

5    Enterprise exchanged scores of e-mails and numerous telephone calls, in which the co-conspirators

6    discussed their plan to "normalize" AWPs at 25%, as well as communications targeting individual

7    manufacturers, PBMs and other members of the pharmaceutical industry with false information

8    intended to hide the Scheme. Additionally, McKesson communicated by e-mail and telephone

9    many times with select retail customers to market its role in the Scheme. McKesson also used e-

10   mail to caution its employees about discussing the Scheme. First Data made false statements in

11   numerous individual e-mails and telephone communications and in public statements on its website

12   about its process of determining AWPs. First Data also used e-mail to caution McKesson against

13   raising AWPs unless the manufacturer announced a price change.

14   **F.    Virginia Relied on the Accuracy of the Falsely Inflated AWPs Published by First Data
     or Medi-Span**

15

16   283. For all times relevant to this lawsuit, Virginia Medicaid reimburses its pharmacies

17   for brand drugs on the basis of AWP. In 2001, the reimbursement rate was AWP-9%, in mid-2002

18   it decreased to AWP-10.25%, where it remained through 2009. The Commonwealth of Virginia

19   relied on FDB as the source of its AWPs.

20   284. The AWP-based reimbursement benchmark for payments in the retail class of

21   pharmaceutical trade has long been acknowledged. The two largest public purchaser programs for

22   prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average

23   wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient

24   costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare

25   arena). Those paying for drugs, by statute or contract, rely on and use the published AWP.

26

27

28

- 82 -

## G. McKesson Knew and Intended that Medicaid Agencies, like Virginia Medicaid, would be Injured by the Scheme.

285. In implementing its fraudulent Scheme, McKesson was acutely aware that Plaintiff and other end payors relied on the AWPs published by First Data and Medi-Span as a pricing benchmark.

286. McKesson maintains, and has maintained for all times relevant to this lawsuit, a Public Affairs Department to track federal and state developments that affect pharmacy sales and to lobby on behalf of its interests and the interests of its primary clients: retail pharmacies.[232] Even outside the Government Affairs Department, McKesson was fully aware of the impact its Scheme would have on Public Payors. Indeed, a McKesson employee specifically questioned Bob James about the impact of rising AWPs on Public Payors:

> Has anyone researched what impact this will have on Medicaid/Medicare reimbursement in states where its [sic] still based on AWP?

James responded:

> *Dale, this is not our issue. But, I have thought about it a lot.* One of the unintended consequences is that Retail Customers will potentially be more profitable.[233]

287. McKesson was not only aware that First Data was the premier industry source for AWP information but also that First Data supplied its pricing information to Medi-Span, thus, as McKesson acknowledged, "[t]his means that Medi-Span data is the First DataBank data." McKesson engaged in a fraudulent scheme with First Data, knowing that First Data was in the best position to cause industry-wide changes to the AWPs and that First Data's purported method of calculating AWPs would both appear to legitimize the increases and keep McKesson's pivotal role in the Scheme a secret.

288. Once McKesson and First Data raised the WAC-to-AWP mark-up to 25% on a given drug, that mark-up remained in place and continued to injure Plaintiff until the September 2009 rollback.

---

[232] *See, e.g.*, MCKAWP 0203514-23; MCKAWP 0203749-50; MCKAWP 0206126-28.
[233] MCKAWP 0069594 (emphasis added).

- 83 -

COMPLAINT
001821-28 451449 V1

1

## H.    Damages Caused by McKesson's Scheme

2      289.    Plaintiff has been injured in its business and property by reason of these violations in

3   that it has made millions of dollars in overpayments it would not have made had McKesson not

4   engaged in its pattern of racketeering activity. McKesson's violations of federal law and its pattern

5   of racketeering activity has directly and proximately injured Plaintiff because it paid many millions

6   of dollars in overpayments for drugs whose AWP was artificially raised as described herein.

7      290.    McKesson and its co-conspirator, First Data, sent AWP information through the U.S.

8   mails or by interstate wire facilities and reported AWPs and other information by the same methods

9   in furtherance of their Scheme. Plaintiff has made inflated payments for drugs based on, or in

10  reliance on, reported and false AWPs.

11     291.    Under the provisions of Section 1964(c) of RICO, McKesson is jointly and severally

12  liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing

13  this suit, including reasonable attorneys' fees.

14
## COUNT II

15
### RICO CONSPIRACY
### (18 U.S.C. § 1962(d))

16

17
### (against McKesson)

18     292.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

19  and further allege as follows.

20     293.    McKesson violated 18 USC § 1962(d) by conspiring to associate with a racketeering

21  enterprise, in violation of 18 U.S.C. § 1962(c). McKesson knowingly joined First Data in a

22  conspiracy to manipulate AWPs in violation of § 1962(c).

23
## I.    McKesson Knew and Adopted the Illegal Purpose of the Enterprise

24     294.    That McKesson knew and adopted the illegal purpose of the Enterprise is evident

25  from its own documents and the testimony of its officers. McKesson's internal communications

26  speak of an express illegal agreement between McKesson and First Data to raise mark-ups on all

27  new drugs as well as other Marked Up Drugs. These documents also reveal that McKesson frankly

28  disclosed to First Data its plan to standardize mark-ups for brand drugs and that it worked closely

- 84 -

COMPLAINT
001821-28 451449 V1

1  together with First Data to implement this plan, supporting an inference of an implicit agreement to

2  create a uniform mark-up for all brand drugs. McKesson's officers have also testified that

3  McKesson artificially raised the mark-ups on its suggested retail prices and provided these false

4  numbers to First Data.

5      295.    Additionally, McKesson's conduct in sending e-mails and other communications to

6  FDB to direct the normalization plan, FDB's conduct publishing AWPs inflated by the uniform 25%

7  mark-up and in sending communications acknowledging that its raised AWPs on some of the NDCs

8  and had yet to make additional changes to NDCs to be consistent with the overall Scheme, as well

9  as e-mails from McKesson bragging about its ability to work with FDB to carry out the

10  normalization plan is consistent with the existence of an agreement to carry out the Scheme.

11  **J.      McKesson Engaged in Activities to Further the Goals of the Enterprise**

12      296.    McKesson actively furthered the goals of the McKesson-First Data Enterprise to

13  defraud end payors. It changed its internal mark-ups on brand drugs with the intention that the

14  changes would affect published AWPs for brand drugs; engaged in frequent discussions with First

15  Data about its plan to raise AWP/WAC mark-ups in the marketplace; made several requests that

16  First Data change the mark-up on various brand name drugs without any mention by either First

17  Data or McKesson of a survey; compiled weekly First Data AWP comparison reports to point out

18  the "problem suppliers" to First Data; discretely boasted about the effects of the Scheme to select

19  customers in order to garner goodwill and improve customer relationships; and maintained the

20  secrecy of the Scheme.

21  **K.      Damages Caused by McKesson's Scheme**

22      297.    Plaintiff has been injured in its business and property by reason of these violations in

23  that it made millions of dollars in overpayments it would not have made had McKesson not engaged

24  in its pattern of racketeering activity.

25  **L.      McKesson is Jointly and Severally Liable for the Conduct of the Enterprise**

26      298.    As co-conspirator, McKesson is jointly and severally liable for all damage that

27  occurred as a result of both its actions and that of First Data's in furtherance of the conspiracy to

28  raise AWPs. Even if McKesson was not specifically told that FDB had stopped conducting AWP

- 85 -

1  surveys when it did, this step was a logical consequence of the McKesson-First Data Enterprise's

2  goal of changing brand drugs to a single mark-up. McKesson is liable for all damages arising from

3  First Data's discontinuation of the survey process in furtherance of the Scheme.

4      299.    Under the provisions of Section 1964(c) of RICO, McKesson is jointly and severally

5  liable to Plaintiff for three times the damages that Plaintiff sustained, plus the costs of bringing this

6  suit, including reasonable attorneys' fees.

7  <div align="center">**COUNT III**</div>

8  <div align="center">**VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT**
**(VIOLATIONS OF VA. CODE §8.01-216.3(A)(1))**</div>

9

<div align="center">**(against McKesson)**</div>

10      300.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

11  and further allege as follows.

12      301.    The Virginia Fraud Against the Taxpayers Act provides in relevant part, that any

13  person who:

14

15  > Knowingly presents, or causes to be presented, to an officer or
> employee of the Commonwealth a false or fraudulent claim for
> payment or approval ... shall be liable to the Commonwealth for a
16  > civil penalty of not less than $ 5,500 and not more than $ 11,000, plus
> three times the amount of damages sustained by the Commonwealth.

17  VA CODE §§ 8.01-216.3(A)(1) and (7).

18      302.    For all times relevant to this lawsuit, Virginia reimbursed its providers for dispensing

19  brand drugs to its beneficiaries on the basis of AWP.

20      303.    As a direct and intended result of its Scheme, the AWPs for the Subject Drugs were

21  fraudulently inflated, thereby causing all providers' claims for payment for these drugs to be false or

22  fraudulent. Accordingly, McKesson knowingly caused Virginia's Medicaid providers to present

23  false or fraudulent claims for payment or approval in violation of the Virginia Fraud Against the

24  Taxpayer, VA CODE 8.01-216.1, *et seq.*

25      304.    By virtue of the false or fraudulent claims McKesson knowingly caused to be

26  presented, Defendant is liable to Plaintiff Commonwealth of Virginia for civil penalties between

27

28

<div align="center">- 86 -</div>

COMPLAINT
001821-28 451449 V1

1  $5,500 and $11,000 for each violation, plus three times the amount of actual damages which the

2  Commonwealth sustained because of McKesson's conduct.

3  ## COUNT IV

4  ### VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT
   ### (VIOLATIONS OF VA. CODE §8.01-216.3(A)(2))

5  **(against McKesson)**

6  305.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

7  and further allege as follows.

8  306.  The Virginia Fraud Against the Taxpayers Act provides in relevant part, that any

9  person who:

10
11  > Knowingly makes, uses, or causes to be made or used, a false record
   > or statement to get a false or fraudulent claim paid or approved by the
   > Commonwealth ... shall be liable to the Commonwealth for a civil
12  > penalty of not less than $ 5,500 and not more than $ 11,000, plus three
   > times the amount of damages sustained by the Commonwealth.

13  VA CODE §§ 8.01-216.3(A)(2) and (7).

14  307.  For all times relevant to this lawsuit Virginia reimburses its providers for dispensing

15  brand drugs to its beneficiaries on the basis of AWP.

16  308.  As a direct and intended result of its Scheme, the false and fraudulent AWPs for the

17  Marked Up Drugs were published, thereby creating a false record for all claims for payment for the

18  Marked Up Drugs. Accordingly, McKesson knowingly caused a false record or statement to be

19  made to get a false or fraudulent claim paid or approved by the Commonwealth in violation of the

20  Virginia Fraud Against the Taxpayer, VA CODE 8.01-216.1, *et seq*.

21  309.  By virtue of the false record McKesson knowingly caused to be made in order to get

22  a false or fraudulent claim paid or approved by Plaintiff, Defendant is liable to Plaintiff

23  Commonwealth of Virginia for civil penalties between $5,500 and $11,000 for each violation, plus

24  three times the amount of actual damages which the Commonwealth sustained because of

25  McKesson's conduct.

26

27

28

- 87 -

COMPLAINT
001821-28 451449 V1

# COUNT V

## VIRGINIA FRAUD AGAINST THE TAXPAYERS ACT
### (VIOLATIONS OF VA. CODE §8.01-216.3(A)(3))

### (against McKesson)

310. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

311. The Virginia Fraud Against the Taxpayers Act provides in relevant part, that any person who:

> Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid … shall be liable to the Commonwealth for a civil penalty of not less than $ 5,500 and not more than $ 11,000, plus three times the amount of damages sustained by the Commonwealth.

VA CODE §§ 8.01-216.3(A)(3) and (7).

312. For all times relevant to this lawsuit Virginia reimbursed its providers for dispensing brand drugs to its beneficiaries on the basis of AWP.

313. McKesson conspired with FDB to defraud the Commonwealth by inflating AWPs of the Marked Up Drugs in order to get a false or fraudulent claim allowed or paid on the basis of the false or fraudulent AWPs. Accordingly, McKesson conspired to get a false or fraudulent claim paid or approved by the Commonwealth in violation of the Virginia Fraud Against the Taxpayer, VA CODE 8.01-216.1, *et seq.*

314. By virtue of its conspiracy to get a false or fraudulent claim paid or approved by Plaintiff, Defendant is liable to Plaintiff Commonwealth of Virginia for civil penalties between $5,500 and $11,000 for each violation, plus three times the amount of actual damages which the Commonwealth sustained because of McKesson's conduct.

# COUNT VI

## VIRGINIA FRAUD STATUTE
### (VIOLATIONS OF VA. CODE §32.1-312)

### (against All Defendants)

315. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

- 88 -

316.   The Virginia Fraud Statute provides in relevant part:

A.   No person, agency or institution, but not including an individual medical assistance recipient of health care, on behalf of himself or others, whether under a contract or otherwise, shall obtain or attempt to obtain benefits or payments where the Commonwealth directly or indirectly provides any portion of the benefits or payments pursuant to the Plan for Medical Assistance and any amendments thereto as provided for in § 32.1-325, hereafter referred to as "medical assistance" in a greater amount than that to which entitled by:

1.   Knowingly and willfully making or causing to be made any false statement or false representation of material fact;

2.   Knowingly and willfully concealing or causing to be concealed any material facts;

* * * *

B.   Any person, agency or institution knowingly and willfully violating any of the provisions of subsection A shall be (i) liable for repayment of any excess benefits or payments received, plus interest on the amount of the excess benefits or payments at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth and (ii) in addition to any other penalties provided by law, subject to civil penalties. The state Attorney General may petition the circuit court in the jurisdiction of the alleged offense, to seek an order assessing civil penalties in an amount not to exceed three times the amount of such excess benefits or payments. Such civil penalties shall not apply to any acts or omissions occurring prior to the effective date of this law.

VA CODE § 32.1-312.

317.   For all times relevant to this lawsuit Virginia reimburses its providers for dispensing brand drugs to its beneficiaries on the basis of AWP.

- 89 -

1        318.    By virtue of its Scheme and conspiracy with FDB, defendants obtained or attempted

2 to obtain on behalf of pharmacy providers excess payments for drugs paid for by the

3 Commonwealth pursuant to the Plan for Medical Assistance by:

4                 a.    knowingly and willfully making or causing to be a false
                     statement or false representation of material fact relating to the
5                      price of the Marked Up Drugs; or

6                 b.    knowingly and willfully making a false statement or false
                     representation about the of material fact through the
7                      dissemination of false AWPs.

8        319.    By virtue of these acts, defendants are liable to Plaintiff, the Commonwealth of

9 Virginia, the amount of excess payments made by the Commonwealth of Virginia, as a result of

10 defendants' violations of the Virginia Fraud Statute, plus interest at the rate of 1.5 percent each

11 month for the period from the date upon which payment was made to the date upon which

12 repayment is made to the Commonwealth and, in addition to any other penalties provided by law,

13 civil penalties in an amount not to exceed three times the amount of such excess benefits or

14 payments.

15                                    **COUNT VII**

16                         **CONSPIRACY TO DEFRAUD**

17                          **(against all Defendants)**

18        320.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

19 and further allege as follows.

20        321.    Defendants entered into an agreement with FDB to secretly and illicitly raise AWP

21 mark-ups without any authorization and with the express intent of defrauding Virginia Medicaid and

22 other payors by causing them to overpay for the Marked Up Drugs.

23        322.    The AWPs defendants caused to be published were false because they had no

24 objective, market-based justification, but instead were skewed to benefit McKesson and its retail

25 pharmacy customers. Additionally, they were false because FDB falsely represented that the AWPs

26 were the result of an objective survey to verify "marketplace reality."

27

28

- 90 -

1     323. The dissemination of false AWPs was a material falsehood because Virginia

2 Medicaid and other payors relied on FDB's published AWPs to reimbursed pharmacies for

3 dispensing brand drugs to their beneficiaries.

4     324. Defendants knew that the prices were false and intended that Virginia Medicaid and

5 others would overpay McKesson's pharmacy customers.

6     325. FDB was the leading publisher of prescription drug prices and it vouched the

7 integrity of its data, including the fraudulently inflated AWPs. Virginia Medicaid, like many other

8 payors, reasonably relied on the published prices of the Marked Up Drugs.

9     326. As a consequence of the fraud, the Commonwealth was harmed by the amount that it

10 overpaid for the drugs.

11                        **PRAYER FOR RELIEF**

12 WHEREFORE, Plaintiff respectfully prays:

13   A. That the acts alleged herein be adjudged and decreed to be unlawful in violation of

14       the federal racketeering laws, the Virginia Fraud Against Taxpayers Act, the Virginia

15       Fraud Statute;

16   B. That Plaintiff recover three-fold the damages determined to have been sustained by it

17       pursuant to 18 U.S.C. § 1964(c) and VA CODE § 8.01-216.3, and that judgment be

18       entered against Defendants in favor of Plaintiff;

19   C. That Plaintiff recover the costs of enforcement pursuant to 18 U.S.C. § 1964(c) and

20       VA CODE § 8.01-216.3(A);

21   D. That Defendants be ordered to pay civil penalties pursuant to VA CODE § 8.01-

22       216.3(A) equal to $5,500 to $11,000 for each false claim filed;

23   E. That Defendants be ordered to pay the amount of excess payments made by the

24       Commonwealth of Virginia as a result of Defendants' violations of the Virginia

25       Fraud Statute plus interest at the rate of 1.5 percent each month for the period from

26       the date upon which payment was made to the date upon which repayment is made to

27       the Commonwealth pursuant to VA CODE § 32.1-312(B);

- 91 -

COMPLAINT
001821-28 451449 V1

F. That Defendants be ordered in addition to any other penalties provided by law to pay civil penalties pursuant to VA CODE § 32.1-312(C), for up to three times the amount of excess payments made by the Commonwealth of Virginia as a result of Defendants' violations of the Virginia Fraud Statute;

G. That Plaintiff be granted such other, further relief as may be determined to be just, equitable and proper by this Court; and

H. That the Court order such other and further relief as the Court deems just, necessary and appropriate.

DATED this 8th day of June, 2011.

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
JEFF D. FRIEDMAN

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman
Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL SHAPIRO LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
Telelphone: (202) 355-6435
Facsimile: (202) 355-6455
jenniferc@hbsslaw.com

- 92 -

COMPLAINT
001821-28 451449 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lelia P. Winget-Hernandez
Assistant Attorney General
VIRGINIA OFFICE OF THE ATTORNEY
GENERAL
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-1584
Facsimile: (804) 786-0807
LWinget-Hernandez@oag.state.va.us

- 93 -

COMPLAINT
001821-28 451449 V1